NORTHERN ILLINOIS UNIVERSITY FOUNDATION, Plaintiff-Appellee, v. ROGER D. SWEET, Director of Revenue, *et al.*, Defendants-Appellants.

Second District No. 2—91—1286

Opinion filed October 23, 1992.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Jerald S. Post, Assistant Attorney General, of Chicago, of counsel), for appellants.

John L. Swartz, of Giffin, Winning, Cohen & Bodewes, P.C., of Springfield, and Brian L. Wolfberg, of Schain, Firsel & Burney, Ltd., of Chicago, for appellee.

JUSTICE GEIGER delivered the opinion of the court:

The defendants, Roger D. Sweet and the Department of Revenue (Department), appeal from an order of the circuit court of McHenry County dated October 9, 1991, which reversed the Department's de-

nial of tax-exempt status for the 1988 calendar year for certain parcels of land located in McHenry County and collectively known as Woodstock Center. We reverse.

The property in question was used for conferences and retreats. The plaintiff, Northern Illinois University Foundation (Foundation), acquired the real estate by quitclaim deed from the Sylvia and Aaron Scheinfeld Foundation (Scheinfeld). The deed contained covenants and restrictions enforceable by the grantor and included the possibility of a reverter to the grantor under certain conditions. The plaintiff, in turn, leased most of the approximately 74 acres to Northern Illinois University (NIU), a public institution governed by an appointed board of regents (see Ill. Rev. Stat. 1987, ch. 144, pars. 301, 302).

When the plaintiff Foundation originally sought a certification of exemption from real estate taxes in 1988, it argued that its property qualified for a tax exemption based on its use for charitable or educational purposes. When this exemption was denied on December 26, 1988, the plaintiff proceeded to an evidentiary hearing before the Department's administrative law judge (ALJ). The Foundation then argued that the property should be considered the property of Northern Illinois University and thus property of the State of Illinois and as such entitled to an exemption (Ill. Rev. Stat. 1987, ch. 120, par. 500.5). In the alternative, the Foundation argued that the property was exempt because it was used for educational purposes and not leased or otherwise used with a view to profit (Ill. Rev. Stat. 1987, ch. 120, par. 500.1).

The ALJ made detailed findings of fact and conclusions of law and denied the exemption. The ALJ determined that the Foundation's property was not property of the State exempt from taxation and that the Foundation failed to establish that the property was used primarily for school or educational purposes and not leased or otherwise used with a view to profit during 1988. The Foundation sought administrative review, and, without specific findings, the circuit court reversed the decision of the Department, stating that it was against the manifest weight of the evidence. This timely appeal followed.

On appeal, the defendants contend that (1) the property is not entitled to an exemption as property belonging to the State of Illinois (Ill. Rev. Stat. 1987, ch. 120, par. 500.5); and (2) the property does not qualify under the educational use exemption (Ill. Rev. Stat. 1987, ch. 120, par. 500.1). The defendants further argue that, to qualify for the educational property exemption, the property must be both "property of" the school and also used "exclusively" for school purposes.

The plaintiff Foundation responds that property may be exempt if it is owned by the State (or other governmental entity) *or* if it is used for educational purposes and not leased or otherwise used with a view to profit. However, the plaintiff argues only that it is entitled to the educational purpose exemption and makes no specific argument that it is entitled to an exemption on the basis of (State) ownership. As such, the plaintiff appears to have abandoned its theories regarding the State ownership exemption as well as the charitable use exemption.

We consider the charitable use theory waived on appeal because it was abandoned in the trial court as it has been here. The State ownership theory has been properly raised on appeal by the defendants. After a careful review of the record and the law, we conclude that the plaintiff has failed to establish that it is entitled to either a State ownership or an educational use exemption. We therefore reverse the judgment of the circuit court and find that the Department's decision was not against the manifest weight of the evidence and should be reinstated.

The record discloses the following relevant facts. In 1949, the Foundation was incorporated as a not-for-profit corporation with these purposes:

> "For educational and charitable purposes; to do all things necessary or convenient to carry out such purposes.
>
> To assist in developing and increasing the facilities of Northern Illinois State Teachers College for broader educational opportunities for, and service to, its students, alumni, citizens of the State of Illinois, and nation by encouraging gifts of money, property, works of art, historical papers and documents, museum specimens, and other material having educational, artistic, or historical value, and by such other proper means as may seem advisable.
>
> In carrying out the aforesaid purposes, the corporation shall have *** the power to purchase, take, receive, lease as lessee, take by gift, devise or bequest, or otherwise acquire, and to own, hold, use and otherwise deal in and with any real or personal property or any interest therein."

On April 27, 1987, Scheinfeld donated the parcels in question by quitclaim deed to the Foundation. The deed contained numerous covenants and restrictions running with the land and inuring to the benefit of and enforceable by the grantor and its successors for a 25-year period. Among the provisions was the possibility of a reverter to the grantor if the grantee attempted to sell the property within 10 years

of the grant, that is, by April 27, 1997. Additionally, any sale by the grantee of the property after 10 years but before 25 years would have to be at not less than the fair-market value or at a price approved by Scheinfeld; any proceeds of such sale, less any capital improvements and any cumulative operating deficit, would have to be used to create an unspecified, permanent, college scholarship endowment fund.

In addition to the restrictions on the Foundation's ability to sell the property, the deed contained a number of restrictions on the use of the property during the first 10 years of the Foundation's ownership. Among these was the requirement that the Foundation make a positive effort to continue to operate the center as a conference center serving a wide spectrum of groups, including groups interested in problem solving and social change and having a special focus on problem solving for low-income and minority communities.

The grantee Foundation was required to continue to serve, among others, higher education and interinstitutional groups, community organizations, professional association advisory boards, policy boards and boards of directors, business and industrial firms, volunteer agencies and organizations and leaderships of statewide professional organizations, including those related to health care and economic education and development. The Foundation was required to take certain steps to maintain a good image in the local community, including conducting an annual meeting with local community leaders, offering a variety of continuing education courses, employing local residents and using local vendors where feasible.

For a 10-year period, the Foundation was not permitted to change the name of the center or any of its main buildings. Any new buildings had to be named for trees and had to be designed to complement the architectural style of the existing buildings. To ensure compatibility, a committee was created whose membership included a member of the Scheinfeld Foundation. Even the center's signage and stationery had certain restrictions. Although the grantee Foundation could convey the property to NIU after April 27, 1992, the university would also have to agree to comply with the restrictions and covenants as they pertained to the Foundation.

During 1988, the Foundation rented 11 acres of the property to a local farmer for $575 per year. It also leased a caretaker's residence on the property and the use of a shed for $200 per month to a private couple who were not employed or associated with the Foundation during 1988. At the request of the donor, approximately 300 square feet of the barn were also used free of charge by Sylvia Scheinfeld's brother-in-law, a sculptor, who lives on adjacent property.

The Foundation leased the remainder of the property to the board of regents on behalf of NIU. The lease incorporated the use requirements established by Scheinfeld. The lease payment was $1 per year, and the lessee was required to pay the costs of acquiring the property. NIU, the lessee, was required to assume the expense of maintaining the property and paying the cost of insurance and utilities; no improvements over $25,000 could be made without the written consent of the lessor Foundation.

The university, in turn, booked the property for use as a conference center by various organizations, initially taking the clients previously served by Scheinfeld. According to the evidence adduced at the Department's hearing, during 1988 the rates for overnight accommodations were $72 per day for nonprofit groups, $82 per day for nonprofit deluxe, and $100 per day for for-profit organizations. During that year, some 87 organizations used the facilities. The ALJ found that 15 of these organizations were for profit and one was a labor union. A sampling of the list of clients includes such organizations or corporations as AFSCME; Cotter & Company; Northwestern University; United Way-McHenry County; Woodstock Christian Care; Aspen in Chicago; Loyola University; American National Can Company; Morton Chemical; Follett Library Book Company; First National Bank of De Kalb; Harding Real Estate Company; Quaker Oats Company; Safeco Insurance Company; Gerald Smith Real Estate; Elgin Chamber of Commerce; Hamilton Partners; Illinois Legislative Black Caucus; Latin American Development; Scheinfeld Foundation Board; and the Henricks family.

At the hearing, Thomas T. Montiegel, vice-president for development and university relations for NIU, testified regarding the relationship of NIU and the Foundation. He stated that NIU had a mandate to serve the educational needs of the 23 most northern counties of the State. NIU sought to establish its physical presence in a number of areas such as by providing an art gallery in downtown Chicago, a Chicago office which worked with community groups, and a summer theatre program in St. Charles. Educational courses were offered at 145 different sites. He believed that the acquisition of the Woodstock Center would be consistent with the university's mission. The manner in which the property was obtained by the Foundation and leased to NIU was attributed to the wishes of the donor, Mrs. Scheinfeld. The most notable limitation on the use of the center was that it be maintained as a conference center for a minimum of 10 years, and NIU was agreeable to this arrangement.

William H. Young, the dean of the college of continuing education for NIU, testified that he saw the center as being "an environment for all kinds of high level thinking. It's that kind of retreat center" without such distractions as television. The groups who came there could work on their own or could involve the university. When asked if the college took an active role with respect to the conferences, Young stated that his staff screened out larger groups or groups that wanted to use the center "just for a hotel" or a picnic and groups that could not benefit from the environment.

Young stated that he and his staff provided programming "involvement" with only about 37% of the clients on the list. One of the physical facilities that the environment provides for is an obstacle course which is used to develop team building. Some NIU campus organizations used the center on occasion in addition to the outside groups. Young stated that conference centers exist at other major universities. He also testified that all revenues from the use of the center go to NIU and any financial deficits in operating the center had to be borne by NIU.

## THE STATE OWNERSHIP EXEMPTION

Significantly, the ALJ found, as matters of fact, that NIU provided programming assistance for only 37% of the users of the center and there was no evidence as to the nature and extent of this program assistance. The ALJ also found that the Foundation held legal title to the property, but it was subject to restrictions and a power of reverter, and that NIU operated the center in 1988 in accordance with the restrictions placed on the property by Scheinfeld. He found that, in 1988, the primary use of the property was for the rental of conference facilities for a fee to any group that wanted to use them and could afford the fee. Additionally, the 11 acres were farmed for profit and a house was also rented for profit.

The ALJ also concluded as a matter of law that, in view of the covenants, the restrictions and the power of reverter in the deed, Scheinfeld, a third party, had substantial control over the ownership and use of the property in question. Therefore, despite NIU's close relationship with the Foundation, the incidents of ownership by the State were not sufficient to exempt the property as property belonging to the State. See Ill. Rev. Stat. 1987, ch. 120, par. 500.5

The ALJ relied on *People ex rel. Olmsted v. University of Illinois* (1927), 328 Ill. 377 (ownership of property by the State sufficient to exempt the property from taxation must be exclusive and free of legal or equitable interest in anyone else—especially where the State,

through its trustees, does not hold the property in trust for the public and where a certain specified class of private persons receives the beneficial interests therefrom); but *cf. Southern Illinois University Foundation v. Booker* (1981), 98 Ill. App. 3d 1062 (distinguished *Olmsted* and found property tax-exempt because the university in fact controlled the property used to house its students and enjoyed its benefits in the manner of an owner in fee simple absolute and foundation merely held naked legal title to the property solely as a convenience to university for purpose of long-term financing; title would eventually vest in university upon payment of mortgage).

In the case at bar, in view of the numerous restrictions placed on the property by the grantor as to its use, control and sale, as well as the possibility of reverter to the grantor, a third party, we agree with the legal conclusion of the ALJ that the property cannot be considered property belonging to the State for tax purposes. The covenants and restrictions inure to the benefit of Scheinfeld, a third party, which retains substantial control over the uses and future disposition of the property. By contrast, NIU, which does not hold legal title, can exercise only very limited control of the property, control that is more in the nature of a tenancy rather than an owner of the fee simple—despite its close association with the NIU Foundation, which merely holds the legal title under conditions established by the grantor. Furthermore, in its appellate brief, the plaintiff Foundation concedes that it is the taxpayer in this case and is an entity wholly separate and apart from NIU itself.

■ Control of the property and the right to its benefits are more significant than legal title alone in determining the liability for real estate taxes. (See *City of Chicago v. Illinois Department of Revenue* (1992), 147 Ill. 2d 484, 505.) The primary incidents of ownership include the right to possession, use, and enjoyment of the property, the right to change or improve the property, and the right to alienate the property at will. (*Wheaton College v. Department of Revenue* (1987), 155 Ill. App. 3d 945, 947.) Because of the significant limitations imposed by Scheinfeld on the use and future disposition of the property, we hold that the property does not belong to the State for tax purposes. The plaintiff's request for the exemption was properly denied on that basis, and the ALJ's decision was not against the manifest weight of the evidence. See *Wheaton College*, 155 Ill. App. 3d at 947.

## THE EDUCATIONAL USE EXEMPTION

■ The plaintiff maintains that the property was also exempt because it was used "exclusively" for educational purposes. The Illinois

Constitution permits but does not require the legislature to exempt from taxation "property used exclusively for agricultural and horticultural societies; and for school, religious, cemetery and charitable purposes" (Ill. Const. 1970, art. IX, §6). The statutory educational use exemption is found in section 19.1 of the Revenue Act of 1939 (Act), which states in pertinent part that exempt property includes:

"[A]ll property of schools *** including the real estate on which the schools are located and any other real property used by such schools exclusively for school purposes, not leased by such schools or otherwise used with a view to profit, including, but not limited to *** housing facilities for students *** and staff housing facilities; and all lands heretofore or hereafter donated, granted, received or used for public school, college, theological seminary, university, or other educational purposes ***. The property described in this Section shall be exempt from taxation *** [when] not leased or otherwise used with a view to profit." Ill. Rev. Stat. 1987, ch. 120, par. 500.1.

Each individual claim of a tax exemption must be determined from the facts presented, and the party claiming the educational use exemption must show that the property is *primarily* (and not incidentally) *used* to fulfill the school's educational objectives or efficient administration. (*MacMurray College v. Wright* (1967), 38 Ill. 2d 272, 278; see *DePaul University, Inc. v. Rosewell* (1988), 176 Ill. App. 3d 755, 757.) The constitution and the statute permit the exemption only on the basis of a qualifying use, and the property must be in actual use for the exempting purpose to qualify for the exemption. (*Illinois Institute of Technology v. Skinner* (1971), 49 Ill. 2d 59, 64-65.) Statutes granting tax exemptions are to be strictly construed, and all doubts regarding the tax-exempt status of property are resolved in favor of taxation. (*People ex rel. Goodman v. University of Illinois Foundation* (1944), 388 Ill. 363, 370; *Wheaton College*, 155 Ill. App. 3d at 947; *Winona School of Professional Photography v. Department of Revenue* (1991), 211 Ill. App. 3d 565, 568-69.) Moreover, the burden of proving the right to a property tax exemption is on the party seeking it, and it must be proved by clear and conclusive evidence. *Winona*, 211 Ill. App. 3d at 569.

In considering a tax exemption based on the property's use, the mere fact that property is held or owned by a charitable or educational institution is insufficient by itself to exempt it from taxation (see *MacMurray College*, 38 Ill. 2d at 278; *International College of Surgeons v. Brenza* (1956), 8 Ill. 2d 141, 144), because it is the the primary use of the property and not the ownership that determines

its taxable status (*Childrens Development Center Inc. v. Olson* (1972), 52 Ill. 2d 332, 336). If the property is leased, it is the primary use of the property, and not its incidental or secondary use, which determines whether the tax-exempt status continues. If the primary use is for the production of income "with a view to profit," the tax-exempt status is destroyed. Thus, if the primary use is tax-exempt even though it may involve the incidental production of income, the property retains its tax-exempt status. *Olson*, 52 Ill. 2d at 336.

Conversely, the fact that some educational use is made of the property does not qualify it for exemption where the primary use is not tax-exempt. See *DePaul University*, 176 Ill. App. 3d at 757-58 (tennis facilities owned and used by university but rented primarily to private club were held to be nonexempt use with a view to profit because they were not used primarily for school purposes even though revenue was applied to school programs); see also *Yale Club of Chicago v. Department of Revenue* (1991), 214 Ill. App. 3d 468 (not all activities, such as fund-raising or recruiting, though beneficial to educational institution, will qualify for tax exemption).

In the case at bar, though some NIU organizations used the center *occasionally*, the *primary* use was the rental of the property to virtually any outside group, including for-profit groups, that wanted to use the facility for its meetings and could afford the rental fees. The NIU staff provided general programming assistance to only 37% of the groups, and the testimony regarding the nature and extent of this assistance is either lacking or vague. Equally vague was the testimony regarding the property's specific uses to further any defined or structured educational program of NIU. Global mission statements such as "to bring about social change" are insufficient. Similarly, in our view, the mere provision of a pastoral environment for "high-level thinking" falls short of showing whether the use made of the property was primarily educational.

■ The plaintiff has not met its burden of proof that the center was used primarily for educational use without a view to profit. The evidence is lacking regarding the actual use made of the property—particularly by those outside users who did not involve the NIU staff in their programs. We are left to speculate as to the nature of the activities that took place on the premises. Any screening out of groups appears to have been on the basis of size more than anything else. We are unable to see how this conference center differs substantially from a privately owned, for-profit conference center or a commercial hostelry.

In addition to the revenue generated by the rental of the conference center, other portions of the property were clearly rented for a profit or for private use without regard to meeting any educational purpose whatsoever. Because the plaintiff has failed to establish clearly its right to the educational use exemption, and because any doubts must be resolved in favor of taxation, we conclude that the ALJ's decision must be sustained; it was not against the manifest weight of the evidence. The plaintiff is not entitled to an educational use exemption for the year 1988.

Because the plaintiff did not establish a primary educational use for the property, we need not decide whether a conjunctive *ownership-and-use* test is required in this type of case.

The judgment of the circuit court is reversed, and the decision of the Department is reinstated.

Reversed.

WOODWARD and DOYLE, JJ., concur.