MIDWEST PHYSICIAN GROUP, LTD., f/k/a Chicago Osteopathic Academic Medical Practice Plan, Ltd., Plaintiff-Appellant, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

First District (3rd Division)    No. 1—97—3976

Opinion filed April 28, 1999.

Lord, Bissell & Brook, of Chicago (Hugh C. Griffin, John M. Hughes, George L. Burgett, and Leslie J. Rosen, of counsel), for appellant.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Edmund C. Baird, Assistant Attorney General, of counsel), for appellees Illinois Department of Revenue and Kenneth E. Zehnder.

Scariano, Kula, Ellch & Himes, Chartered, of Chicago (Robert H. Ellch and Brian J. Fahey, of counsel), for appellee Board of Education of Rich Township High School District No. 227.

JUSTICE BURKE delivered the opinion of the court:

Plaintiff Midwest Physician Group, Ltd., formerly known as Chicago Osteopathic Academic Medical Practice Plan, Ltd., appeals from an order of the circuit court on administrative review affirming defendant Illinois Department of Revenue's decision that Midwest Physician Group was not entitled to an exemption from real estate taxes for 1992, 1993, and 1994 with respect to its three-story office building and adjacent parking lot located in Olympia Fields, Illinois, under either the "charitable purposes" exemption (35 ILCS 200/

15—65 (West 1994)) or the "schools" exemption (35 ILCS 200/15—35 (West 1994)) provisions of the Illinois Property Tax Code (Tax Code) (35 ILCS 200/1—1 *et seq.* (West 1994)). On appeal, Midwest Physician Group argues that: (1) it met the six guideline factors recognized in *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149, 233 N.E.2d 537 (1968), which are determinative of whether the use of property is for charitable purposes, and its case is indistinguishable from *Lutheran General Health Care System v. Department of Revenue*, 231 Ill. App. 3d 652, 595 N.E.2d 1214 (1992), thus entitling it to a charitable exemption; and (2) it fulfilled the requirements for a school exemption because the subject property is used for the administration of Midwest Physician Group, whose members comprise the "core clinical faculty" at Midwestern University, and the administrative functions performed on the property were "vital to the efficient administration of the clinical faculty" at Midwestern University. For the reasons set forth below, we affirm.

The Chicago Osteopathic Academic Medical Practice Plan, Ltd. (Chicago Osteopathic), was formed in 1975 and operated as a division of Midwestern University from 1975 until 1981. Chicago Osteopathic remained as a division of Midwestern University until it was separately incorporated in 1982 under the Illinois Business Corporation Act (805 ILCS 5/1.01 *et seq.* (West 1996)) as a for-profit medical practice group and recognized as a section 501(c)(3) federal tax exempt organization by the Internal Revenue Service. Chicago Osteopathic relocated to a three-story, 15,000-square-foot office building and parking lot in Olympia Fields in 1981 and occupied the building under a lease agreement from 1981 until 1984. Chicago Osteopathic purchased the property on December 15, 1984, and the building was used for its administrative purposes. Pursuant to an amendment to its articles of incorporation in 1993, Chicago Osteopathic changed its name to Midwest Physician Group, Ltd. (MPG).

In an action prior to the case at bar, MPG, then known as Chicago Osteopathic, sought a property tax exemption from the Illinois Department of Revenue (Department) for the 1985 tax year. MPG argued in that case that it was entitled to a charitable purposes exemption. The Department denied the exemption, finding:

> "[T]he benefits derived [from the property] were primarily for the benefit of the physician members of [Chicago Osteopathic]. [Chicago Osteopathic], I find, did have capital, capital stock, and shareholders. However, [Chicago Osteopathic] did not profit from the enterprise. [Chicago Osteopathic] funds, I find, were derived primarily from fees for services, and were used for the purposes expressed in the charter. [Chicago Osteopathic] failed to demon-

strate, I find, that charity was dispensed to all who needed and applied for it, and that no obstacles were placed in the way of those seeking the benefits. Finally, I find, that the primary use of this property was not for charitable purposes, but for the benefit of [Chicago Osteopathic] stockholder members during 1985."

In subsequently affirming the Department's decision, the trial court stated:

"[Chicago Osteopathic] is not a charitable organization. It consists of a group of physicians who are paid a salary for their services. [Chicago Osteopathic] was organized to attract patients and any incidental benefits to the College or community are far outweighed by the benefits to [Chicago Osteopathic]. All patients are billed and only after it is determined that the debt is uncollectible are these debts written off as charity. The parcel in question is an office building. No medical care is dispensed from the premises and it cannot be said that charity is dispensed in any form from the premises.

The fact that an organization donates time or money which may indirectly benefit the public by making available competent medical care is insufficient to establish that a group is entitled to a charitable exemption. Although the College, the centers and the clinics are charitable institutions, [Chicago Osteopathic] is not. Furthermore, it does not stand in the place and does not qualify for the exemption."

MPG again sought a tax exemption for the property for the tax years 1992, 1993, and 1994, which are at issue in this appeal. MPG based its request for exemption for the 1992 and 1993 assessment years on the "charitable institutions" exemption pursuant to section 19.7 of the Tax Code (35 ILCS 205/19.7 (West 1992)). For the 1994 assessment year, MPG based its request on the "charitable purposes" exemption pursuant to section 15—65 of the Tax Code (35 ILCS 200/ 15—65 (West 1994)). MPG alternatively requested an exemption based on the "school property" exemption for the 1992 and 1993 assessment years pursuant to section 19.1 of the Tax Code (35 ILCS 205/19.1 (West 1992)). For the 1994 assessment year, MPG based its request under the "Schools" exemption pursuant to section 15—35 of the Tax Code (35 ILCS 200/15—35 (West 1994)). Notwithstanding that the statutory provisions providing for a school and charitable exemption differed slightly for these assessment years, the parties agreed that the result should be the same under either the earlier or later provisions, and that there was no need to engage in a separate analysis under the different versions of the exemption statutes. The Department denied the exemption for 1992, 1993 and 1994.

Thereafter, MPG requested a formal hearing before the Depart-

ment, which was held on January 22, 1996. Intervenor Board of Education of Rich Township High School District No. 227 (Board of Education) appeared at the hearing to oppose MPG's applications for the tax exemptions. Louis Porn, the chief executive officer of MPG, testified that MPG's physicians are the clinical faculty for Midwestern University, "which is the Chicago College of Osteopathic Medicine," and Midwestern University owns the Chicago Osteopathic Health System (COHS). Porn further stated that Midwestern University is an accredited medical school in Illinois for osteopathic physicians and consists of two hospitals, the Olympia Field Osteopathic Medical Center and the Chicago Osteopathic Medical Center (medical centers) in Hyde Park, and 19 outreach clinics located in Chicago, collectively referred to as COHS.

Porn also testified that MPG employed approximately 150 to 200 physicians and that most of the members were clinical faculty of Midwestern University. According to Porn, MPG physicians constituted more than 90% of the clinical faculty of Midwestern University. Porn further stated that not all of the physicians who practice at the medical centers are members of MPG. Porn also stated that members of MPG were on the medical staff of COHS facilities.

Porn further stated that in order for a physician to become a shareholder of MPG, he or she was required to purchase one share of stock for $10 par value upon joining MPG, was required to sell the stock for the same price upon leaving MPG, and no dividends were paid on the stock. The salaries of MPG's physicians were set by the dean of Midwestern University and the department chairmen, who were appointed by the dean and were subject to oversight by a board of directors, COHS and senior medical staff, and were to be comparable to similarly situated doctors at other hospitals in the Chicago area. Porn also stated that the relationship between Midwestern University, MPG, and the COHS facilities was set out in the "Physician Services Agreement," entered into on March 18, 1983, and the "Affiliation Agreement," effective July 1, 1993. These two agreements characterized MPG as an independent contractor and stated that MPG's physicians' salaries were to be reasonable in amount and competitive in the market place. The MPG members were also compensated by wages and benefits that included a pension plan, disability coverage, malpractice insurance, and reimbursement for business expenses.

Porn further stated that MPG provided approximately $800,000 to $900,000 in charity or free care to patients each year in question, including the "Hill-Burton" indigent patients. Porn also explained that COHS received federal grants for the construction of its facilities under the Hill-Burton program and were obligated to provide free care

to indigent patients. For each tax year in question here, approximately $34 million was discounted for Medicare and Medicaid contractual allowances.

Porn further testified that approximately 80 to 90 MPG employees worked in MPG's building to provide for "the total administrative support for the physicians' total work." The employees in the building performed tasks that included the scheduling for academics, negotiations with the university, billing, administration of the managed care contracts for service, human resources function, and physician benefits. The general finance department was also located in the building. Porn further stated that no patient treatment nor any instructional program occurred on the premises.

Porn also stated that some members of MPG maintained a practice outside of MPG. The physicians did not use the MPG facilities to bill the patients, but some did use the COHS facilities to engage in their private practice. Porn further stated that the revenue generated by MPG was a result of billing and collecting from physician services to patients, and from Midwestern University for teaching services. The percentage of patients treated by MPG's physicians that used Medicare or Medicaid to pay their bills ranged from 45% to 50%. Between $4 to $5 million was written off by MPG as uncollectible each tax year. Porn also explained that MPG would attempt to collect on an account through letters and collection agencies prior to writing off the debt, and that MPG would not resort to the courts for collection. Pursuant to the "Affiliation Agreement," MPG was required to contribute a percentage of its revenue to Midwestern University, which totaled $3.5 to $3.9 million to the university and $3 million to the medical centers' clinics for the years at issue.

Dr. James Charles Murray, a shareholder and chairman of MPG's board of directors, testified in behalf of MPG. Dr. Murray stated that he had held his share in MPG since its inception in 1982 and he had paid $10 for the share. Dr. Murray also stated that if he sold his share, he would receive $10 and he had never received a dividend on his share. Murray further stated that a physician's compensation is computed by the administrative staff by making an estimate at the beginning of the year as to what revenues the department would be receiving, then the departmental chairman would make his recommendation as to how the money would be split up. The dean of the medical school would then approve or disapprove of the recommendation. Murray also stated that in the event of a shortfall in the revenues, the physicians were expected to pay back the overpayment of money, or would defer paying back the money for a year and try to make up the revenue the next year. If there was an overage, it would be split up

between members of the department according to the dean's guidelines. Murray further stated that the patients' bills were sent out in the name of MPG and MPG collected the funds and used them to pay the physicians' salaries. Signs were also posted at the hospital facilities to indicate free care was available, and Murray himself had admitted patients whom he knew did not have the ability to pay.

According to MPG's bylaws, members who devoted at least "two-thirds percent or more of their professional activities, as determined by the Directors, to the work of the Corporation" were entitled to become shareholders in MPG. The management of MPG was directed by the board of directors, which was made up of 34 members of MPG. Members of the board of directors were not compensated. According to MPG's "Consolidated Statements of Revenue and Expenses and Changes in Fund Balance" for 1992, 1993 and 1994, MPG received revenue from "net patient service revenue," "teaching and administrative revenue," "interest and other income," and "insurance underwriting income."

On September 23, 1996, the Department rendered its decision, denying MPG's request that an exemption be granted for the tax years 1992, 1993 and 1994. With respect to the school exemption, the administrative law judge (ALJ) who presided over the hearing stated:

"The parcel here in issue is owned by [MPG] and not the College and according to the evidence and testimony was used exclusively for the administrative functions of collecting fees earned by the stockholders and administering the numerous benefit packages provided to the stockholders and not for classroom work or teaching in a clinic or hospital setting.

I therefore conclude the parcel here in issue and the three story building thereon did not qualify for the school exemption as set forth in 35 ILCS 205/ILCS 205/19.7 or 35 ILCS 200/15—35 for the 1992, 1993 and 1994 assessment years."

With respect to the charitable purposes exemption, the ALJ stated:

"[MPG] is organized pursuant to the "Business Corporation Act" and is incorporated as a Medical Corporation. [MPG's] attorney points out that the applicant's stockholders purchase a share of stock in the corporation for $10.00, and if they leave the service of the corporation must sell it back for the same $10.00. He also points out that no dividends are paid on the stock. However, he fails to point out that the stockholders set their own salaries as employees of the corporation as well as providing themselves with employee benefits including a pension plan, disability coverage, reimbursement of business expenses and malpractice insurance. *** In addition, it has been observed that no teaching of the students of the College, and no delivery of medical care to patients

takes place at the building on this parcel. The activities which take place at the three story building on the parcel here in issue concern the collection of fees from patients and the administration of the various perks and benefits provided to the physician stockholder employees of [MPG]."

The Department's Director adopted the ALJ's recommendation and, on November 1, 1996, MPG filed a complaint in the circuit court pursuant to the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1996)) requesting reversal of the Department's decision. At a hearing on MPG's complaint on September 17, 1997, MPG argued that the property qualified for a charitable exemption under the six *Korzen* guideline factors. The six factors are that the benefits derived are for an indefinite number of persons, the organization has no capital, capital stock or shareholders, and does not profit from the enterprise, funds are derived mainly from private and public charity and are held in trust for the objects and purposes expressed in the charter, the charity is dispensed to all who need and apply for it, no obstacles appear to be placed in the way of those seeking the benefits, and the exclusive use of the property is for charitable purposes. MPG argued the first factor was met because its physicians-employees were not allowed to maintain a private practice through MPG; the billings and monies received were the property of MPG; and the physicians' salaries were determined by MPG's heads of staff and subject to review by COHS. MPG also argued that its physicians provided charitable care, performed educational research activities and contributed several million dollars per year to the affiliated medical school, and supported a system of outreach clinics run by COHS. MPG maintained that the fact the doctors were paid a reasonable salary and received fringe benefits did not mean that the first factor was not met.

MPG further argued that the facts of its case were "virtually identical" to those in *Lutheran General* as to the second factor because its doctors were allowed to buy a share of MPG for $10 upon becoming employees, received no dividends, received no benefit if the corporation were to be liquidated, and were required to sell the shares back for the same $10. With respect to the third factor, MPG argued *Lutheran General* was "directly on point" because funds were received by MPG from Medicare and Medicaid and free care was given to indigent persons. Additionally, MPG argued that lawsuits were not filed if the patients were not able to pay. MPG also argued that the collected fees were used to further "the purposes and objectives of MPG," through paying the operating expenses, physicians' expenses, the administrative staff and making contributions to charitable organizations.

MPG further argued, based on Porn's and Dr. Murray's testimony, that the fourth factor was met because no one was turned away for treatment as a result of an inability to pay, some patients were given free care, and Medicaid and Medicare payments were accepted at discount rates. MPG also argued that the fifth factor was met because patients were informed by pamphlets and notices at the admitting desk that free care was available. As to the sixth factor, MPG argued that Porn's testimony showed that the subject property was used by administrative personnel and was "vital to the continued ability of MPG to provide medical care at COHS facilities." MPG also argued that the fact that medical care was not provided on the property should not make it ineligible for the charitable exemption.

With respect to a school exemption, MPG argued it was entitled to the exemption because "MPG doctors themselves form the mass bulk of the staff *** at Midwestern University, an accredited medical school." MPG also maintained that, based on Porn's testimony, "it would be difficult if MPG's facility did not exist for the doctors to perform their role as clinicians at the university."

In response to MPG's charitable exemption argument, defendants argued that MPG and its physicians worked as independent contractors pursuant to an affiliation agreement with COHS and were a "distinct entity." Defendants further argued that the fact that COHS provided services for indigents and for patients under the Hill-Burton Act did not "come into play" in determining whether MPG used its property for charitable purposes. Defendants also argued that MPG used its property for the efficient running of MPG's activities and not COHS' activities. Defendants further argued that the MPG property was used exclusively for the administration of MPG in that the property housed "the executive and administrative personnel for management, administration, billing, collections, accounting and other payroll functions," and no patient treatment took place on the property. Defendants also distinguished the case at bar from *Lutheran General*, arguing that MPG's physicians earn a competitive salary, the physicians can have an outside practice, and no charitable activities or patient care takes place on the property.

Defendants further argued MPG was not entitled to a school exemption because the Tax Code did not exempt property that was used to support educational activities but, rather, property that was used exclusively for school purposes. Defendants maintained that MPG's property was not used exclusively for school purposes because it was used for administrative purposes such as "administrating MPG's payroll, salary, and employee benefits."

On September 26, 1997, the trial court affirmed the Department's

decision, based upon its application of the *Korzen* factors. Specifically, in finding that MPG was not entitled to a charitable exemption, the trial court stated:

"In this court's view, consideration of *** [the *Korzen*] factors leads to the clear conclusion that the Department did not err in denying the charitable exemption for the subject property.

As to the first factor, *** MPG is a for-profit corporation which exists for the primary purpose, indeed for the predominant purpose, of benefiting its physician/shareholders. Its principal activities are to bill and, if necessary, to engage in collection practices, relative to services provided to patients by the physicians of MPG. A substantial portion of the revenue raised by these activities are then paid to MPG's physician/shareholders as salary.

Importantly, the salaries of the physician/shareholders of MPG must be set at comparable levels to those earned by physicians engaged in private practice in the Chicago area. Additionally, MPG allows its physicians to engage in outside practices. Together, these features strongly suggest that MPG is engaged in a commercial enterprise, not a charitable one. These factors also serve to distinguish the nature of MPG's enterprise from the medical practice at issue in *Lutheran General Health Care System v. Department of Revenue*, 231 Ill. App. 3d 652 (1st Dist., 1992), which is relied upon by MPG. ***

Furthermore, MPG's association with the charitable organizations of Chicago Osteopathic Health Systems [COHS] is far too distant to allow MPG to dress itself as a charitable organization by counting among those it benefits the people who receive treatment through the facilities of the System. MPG and Chicago Osteopathic Health Systems themselves described this affiliation in terms of MPG being an 'independent contractor.' *** This lack of close relationship between the charitable medical provider and the subject again constitutes a significant difference from the facts presented in *Lutheran General*. ***

Finally, that a portion of MPG's very substantial revenues were given to certain of the not-for-profit affiliates of Chicago Osteopathic Health Systems fails to demonstrate that MPG is itself a charitable institution. ***

As to the second factor, *** the stockholders here directly benefit from their ownership of MPG in a way not found in *Lutheran General*. The clear focus of the second factor is whether individuals profit from the enterprise, not the narrower inquiry of whether dividends are paid or the stock is allowed to appreciate. *** Here, the mechanism by which the shareholders of MPG profit is neither dividends nor appreciation, but the market-rate salaries which MPG is obligated to pay them. Additionally, the physician/

shareholders, through MPG's Board of Directors, have the power to determine the amounts of these salaries. Because the physician/shareholders profit in these significant ways from their ownership in MPG, the second factor of *Korzen* has not been met. ***

As to the third factor, MPG does not receive its funds from public or private charity, but rather from the patients of its physician/shareholders. Furthermore, these funds are not held in trust for a charitable purpose, but rather are spent principally in paying the salaries of the physician/shareholders of MPG and administering their benefit plans.

As to the fourth and fifth factors, MPG maintains that it disbursed charity to all in need and that there were no barriers to those seeking benefits. Again, these arguments depend on acceptance of the premise that MPG is so intimately linked with Chicago Osteopathic Health Systems, that the charitable works of Systems should be attributed to MPG. For the reasons discussed above, the court cannot accept this premise. Instead, the court finds that there is no evidence in the record showing that MPG disbursed charity to all who were in need or that there were no barriers to charity.

Finally, as to the sixth factor, the court finds that the primary use of the property was not charitable in nature. No treatment or medical research took place at the subject parcel. Rather, the subject property was used by a for-profit medical practice plan for the primary purposes of billing patients and collecting debts. Again, the use here stands in sharp contrast to the use of the property in *Lutheran General*, which was for medical research, patient treatment and teaching."

In finding that MPG was not entitled to a school exemption, the trial court stated:

"Here, the property is owned by a for-profit corporation. Its primary use is the operation of a private medical practice plan. There is no educational use made of the property, nor is the property's use related to the efficient administration of Midwestern University, the medical school affiliate of Chicago Osteopathic Health Systems. That some of the revenue generated by MPG is donated to Midwestern University does not approach the requirement that the property's primary use be for educational purposes."

This appeal followed.

■ The scope of review under the Administrative Review Law extends to all questions of law and fact presented by the entire record before the court. 735 ILCS 5/3—110 (West 1996). The reviewing court's function is limited to determining whether the Department's decision is against the manifest weight of the evidence. *Nokomis Quarry Co. v.*

*Department of Revenue*, 295 Ill. App. 3d 264, 267, 692 N.E.2d 855 (1998); *Institute of Gas Technology v. Department of Revenue*, 289 Ill. App. 3d 779, 782, 683 N.E.2d 484 (1997); *Evangelical Hospitals Corp. v. Department of Revenue*, 223 Ill. App. 3d 225, 229, 584 N.E.2d 1004 (1991). However, when the facts are undisputed, as in this case, a determination of whether property is exempt from taxation is a question of law. *Institute of Gas Technology*, 289 Ill. App. 3d at 782; *Chicago Patrolmen's Ass'n v. Department of Revenue*, 171 Ill. 2d 263, 271, 664 N.E.2d 52 (1996).

On appeal, MPG first argues that the trial court's affirmance of the Department's decision should be reversed and the cause remanded with directions to allow the charitable property tax exemptions for the years 1992, 1993 and 1994. MPG maintains that it met the six *Korzen* factors, which have been recognized by Illinois courts in determining whether the use of property is for charitable purposes. MPG also argues that the facts of its case are analogous to *Lutheran General* in which this court held that an organization that operated hospitals and a physicians group was entitled to a charitable exemption based upon the *Korzen* factors.

The Department contends that MPG was not entitled to a charitable exemption because MPG existed for the benefit of its shareholders, who were MPG's physicians, and MPG's activities were not charitable in nature. Defendant argues that MPG's physicians were paid "nearly half of the patient billing revenues in cash or benefits" and the physicians' compensations were "linked to the volume of billing their department generate[d]." The Department maintained that MPG was "controlled by physician shareholders," "set their own compensation levels," were "compensated in relation to the billing they generate[d]" and used corporation assets to "increase the volume of patient billing," and, therefore, was not entitled to the exemption. The Department also argues that *Lutheran General* is distinguishable from the present case because the physicians in that case spent 52% of their time on educational, research and administrative activities, they received below market incomes, and they were not allowed to maintain a private practice. The Department argues that in the present case, MPG's physicians "had an interest in the fees they generate[d]," "develop[ed] their own practices," produced no evidence of the time MPG's physicians spent on education, research, and administration, and the physicians' incomes were "directly tied to the fees they generate[d]."

Defendant Board of Education of Rich Township High School District No. 227 (Board of Education) argues that MPG's property "was used exclusively to house the executive and administrative em-

ployees necessary to operate MPG," and that "[t]he creation and dissemination of invoices to paying customers, as well as the administration of employee benefits for MPG members have nothing to do with the provision of charity by other entities."

Before addressing MPG's charitable purposes exemption argument, we first consider the Department's argument, raised for the first time on appeal, that MPG was collaterally estopped from seeking a charitable exemption on its property because MPG litigated this question before the Department and the trial court for the 1985 tax year. While the Department concedes that this issue was not raised at trial, it argues that "a reviewing court may affirm a lower court's decision on any grounds presented by the record." MPG counters that collateral estoppel would not have applied because the circumstances had changed since the trial court's ruling in the 1985 case. MPG maintains that the basis for the trial court's ruling in the 1985 case was that MPG's predecessor corporation had issued stock, and that after *Lutheran General*, the law changed so that now a corporation's issuance of stock to its shareholders is no longer a bar to a charitable exemption. MPG further argues that collateral estoppel is an affirmative defense that defendants were required to plead at trial and did not.

■ Collateral estoppel "is an affirmative defense which must be pleaded to be available" and is considered waived if not raised at trial. *Waste Management of Illinois, Inc. v. Pollution Control Board*, 187 Ill. App. 3d 79, 83-84, 543 N.E.2d 505 (1989). In the present case, because the Department did not raise collateral estoppel as an affirmative defense at trial, it has waived this issue for review. Moreover, we briefly note that collateral estoppel applies where the facts in the case are disputed, and, in the present case, the facts are not in dispute. *Nokomis*, 295 Ill. App. 3d at 267-68. Therefore, collateral estoppel is inapplicable here, and we proceed to the merits of this appeal.

■ It is well settled that statutes exempting property from taxation are to be strictly construed in favor of taxation. *Harrisburg-Raleigh Airport Authority v. Department of Revenue*, 126 Ill. 2d 326, 331, 533 N.E.2d 1072 (1989). In determining whether property is included within the scope of a tax exemption, all facts are to be construed and all debatable questions resolved in favor of taxation. *City of Chicago v. Illinois Department of Revenue*, 147 Ill. 2d 484, 491-92, 590 N.E.2d 478 (1992). Each individual claim for exemption must be determined from the facts presented. *Chicago Patrolmen's Ass'n*, 171 Ill. 2d at 271. The taxpayer seeking the exemption bears the burden of proving by clear and convincing evidence that the exemption applies. *Evangelical Hospitals*, 223 Ill. App. 3d at 231. The deci-

sion as to whether property is exempt then depends solely upon the application of the appropriate legal standard to the undisputed facts. *Du Page County Board of Review v. Joint Comm'n on Accreditation of Healthcare Organizations*, 274 Ill. App. 3d 461, 467, 654 N.E.2d 240 (1995).

■ The legislature is empowered to exempt certain property from taxation pursuant to article IX, section 6, of the Illinois Constitution, which provides:

> "The General Assembly by law may exempt from taxation only the property of the State, units of local government and school districts and property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes." Ill. Const. 1970, art. IX, § 6.

Section 15—65 of the Tax Code provides an exemption for property used for, charitable purposes, *i.e.*:

> "All property of the following is exempt when actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit:
>
> (a) Institutions of public charity." 35 ILCS 200/15—65 (West 1994).

Two elements are required to entitle property to an exemption: exclusive use for charitable purposes and ownership by a charitable organization. *Institute of Gas Technology*, 289 Ill. App. 3d at 783, citing *Chicago Patrolmen's Ass'n*, 171 Ill. 2d at 270; *Evangelical Hospitals*, 223 Ill. App. 3d at 229. The term "exclusive use" refers to the primary purpose for which the property is used, and not to the secondary or incidental purpose. *Evangelical Hospital Ass'n v. Novak*, 125 Ill. App. 3d 439, 441, 465 N.E.2d 986 (1984), citing *Korzen*, 39 Ill. 2d at 156.

■ In *Institute of Gas Technology*, the court, in reviewing the issue of whether a property was entitled to a charitable tax exemption, relied upon *Korzen*, stating:

> "In *** *Korzen*, *** the Illinois Supreme Court outlined the following criteria in evaluating whether property is exempt from taxation based on a charitable use:
>
> ' "(1) the benefits derived are for an indefinite number of persons [for their general welfare or in some way reducing the burdens on government]; (2) the organization has no capital, capital stock or shareholders, and does not profit from the enterprise; (3) funds are derived mainly from private and public charity, and the funds are held in trust for the objects and purposes expressed in the charter; (4) the charity is dispensed to all who need and apply for it; (5) no obstacles appear to be placed in the way of those seeking the benefits;

and (6) the exclusive (primary) use of the property is for charitable purposes." ' [Citations.]" *Institute of Gas Technology*, 289 Ill. App. 3d at 784.

"[T]he *Methodist Old Peoples Home* [*Korzen*] factors are guidelines and not definitive requirements." *Institute of Gas Technology*, 289 Ill. App. 3d at 784. A rigid formula is not to be applied to all fact situations, but instead "courts consider and balance the guidelines by examining the facts of each case and focusing on whether and how the institution serves the public interest and lessens the State burden." *Du Page County Board of Review*, 274 Ill. App. 3d at 469.

■ In the present case, MPG contends that it is entitled to a charitable purposes exemption because its case is analogous to *Lutheran General*, where the charitable exemption was allowed. MPG argues that the primary use of its property is charitable in character because it is essential to MPG's charitable purpose of dispensing medical care to all who need it at all of the COHS facilities. MPG further argues that it met the first *Korzen* factor, whether the benefits derived are for an indefinite number of persons, based on the fact that its physicians treated patients regardless of their ability to pay, treated Medicare and Medicaid patients, made monetary contributions to Midwestern University and its clinics, performed research at the university, and its physicians had no interest in the fees collected.

Defendants argue that MPG operated for the profit of its shareholders, as evidenced by the facts that MPG physicians were paid at market rates and its board of directors, which was controlled by the physicians who were the shareholders, set the physicians' salaries.

The trial court found that MPG is a for-profit corporation that exists for the primary purpose of benefiting its physician/shareholders. The factors that led the trial court to this conclusion were that the activities conducted on the property were billing and collection practices relative to the services provided to patients, the physicians' salaries were set at comparable levels to other physicians in private practice in the Chicago area, and some physicians were engaged in outside practices.

We agree with the trial court. The office building of MPG houses MPG's executive and staff personnel. The employees in the building exclusively provide the billing and collection services for MPG's physicians and they administer the physicians' benefits package. No patient care or instructional classes took place on the property. Accordingly, the activities conducted on the property cannot be viewed as charitable in nature and we are not persuaded by MPG's arguments to the contrary. As the trial court noted, MPG's association with Midwestern University and the COHS facilities is "far too distant to allow MPG to

dress itself as a charitable organization." Moreover, the "Affiliation Agreement" between MPG and COHS described MPG as an "independent contractor," and COHS has no connection with MPG's property.

This case is readily distinguishable from *Lutheran General*, as the trial court pointed out, because the physicians in *Lutheran General* received salaries below market levels and were prohibited from maintaining outside practices. In addition, the property in *Lutheran General* was owned by a charitable organization, Lutheran General Health Care System, and the property was leased to a physicians group which used the property for the operation of an out-patient clinic. MPG's attempt to show how its position is similar to *Lutheran General* fails because MPG's use of its property was only incidental, not primary, to the charitable nature of Midwestern University and COHS, and we view this use as a benefit to MPG and its shareholders.

With respect to the second *Korzen* factor, whether the organization has capital, capital stock or shareholders and does not profit from the enterprise, MPG argues that it met this factor based upon the facts that its physicians paid only $10 for a share of MPG's stock and surrendered it upon leaving MPG. MPG also argues that the shareholders received no dividends and the directors of the board were not paid.

Defendants argue that the shareholders who controlled MPG were free to distribute the profits by paying market rate salaries to themselves, as MPG's physicians, and the mere fact that MPG's physicians took their profits through their salaries, as opposed to dividends, did not vitiate the reality that the physicians were profiting from MPG's activities.

The trial court agreed with MPG that the fact that it has stockholders should not disqualify it from a charitable exemption. However, the trial court found, and we agree, that the stockholders directly benefited from their ownership of MPG in a way that was different from *Lutheran General*. As the trial court stated, "the focus of the second factor is whether individuals profit from the enterprise." Therefore, the market-rate salaries that MPG paid its physicians, along with the power of its board of directors to determine the salaries, demonstrated how the physicians profited. Again the facts of this case are distinguishable from *Lutheran General* in which that court found the possibility too remote that the physicians profited from the physicians group activities. *Lutheran General*, 231 Ill. App. 3d at 663.

With respect to the third *Korzen* factor, whether the funds are derived mainly from private and public charity and the funds are held in trust for the objects and purposes expressed in a charter, MPG argues that it met this factor based upon the fact that, like all hospitals, the fees collected were used to pay the physicians' salaries,

fund clinics, fund COHS, and pay operating expenses. MPG asserts that if it did have income in excess of its expenses, the money was used for furthering MPG's charitable purpose according to its articles of incorporation, such as discounting fees under Medicare and Medicaid, providing free care to patients, and making contributions to Midwestern University.

Defendants argue that MPG's physicians were paid nearly one-half of the patient billing revenues in cash and benefits. Defendants also argue that the salaries of MPG's physicians were linked to the volume of billing their department generated. MPG's physicians received a draw on their salaries from expected revenue and, therefore, the physicians would bear the risk of meeting the projected revenues; and if the physicians did not meet their billing goals, they were required to pay back the excess money received from their distributions.

The trial court determined that MPG received its funds from the patients of its physician/shareholders and that these funds were not held in trust for a charitable purpose but rather were spent principally in paying the salaries of MPG's physician/shareholders and for administering their benefits plan. The trial court therefore concluded that MPG did not meet the requirements of the third factor. We agree. The fees collected by MPG on the property in issue were generated from patients who were billed for the services performed by MPG's physicians. While we are aware that "the source of funds is not the sole determinant factor" in determining whether an institution is charitable (*Lutheran General*, 231 Ill. App. 3d at 664), this case is distinguishable from the facts of *Lutheran General*, in which the court found that the fees collected that were used to pay the physicians' salaries, lease the property, purchase physician services, fund research, and other operating expenses were enough to characterize it as a charitable enterprise. In the present case, as discussed above, the primary use of MPG's property benefitted its physicians, who received market-rate salaries and a benefits package that were administered from the property. After consideration of the first three factors, we therefore find that MPG's use of its property was not for charitable purposes.

Under the fourth and fifth *Korzen* factors, that charity is dispensed to all who need and apply for it and that no obstacles are placed in the way of those seeking benefits, MPG argues that all patients were informed that free care was available through signs posted at the hospital and brochures. MPG also maintains that indigent patients received free care and Medicare and Medicaid patients received care at a billing rate of approximately 20% to 60% of the normal rate.

Defendants argue that MPG uses collection letters and collection

agencies in an attempt to collect on its outstanding bills and the fact that MPG writes off a bad debt is a business decision, not charity. Defendants also argue that the fact MPG serves the federally subsidized population does not make MPG's activities charitable in nature. Defendants lastly argue that the COHS facilities are required to provide free care under the Hill-Burton program and, therefore, this care, which MPG relies upon here to establish MPG's entitlement to a charitable tax exemption, cannot be said to be a charitable activity.

The trial court found, and we agree, that the record contains no evidence in support of MPG's argument that MPG was "so intimately linked with *** [COHS], that the charitable works of *** [COHS] should be attributed to MPG." As discussed above, the primary use of MPG's property was as an administrative office center that benefitted the physician/shareholders. Any charitable purpose that could be found from the relationship MPG had with the COHS facilities was simply incidental.

Finally, with respect to the sixth *Korzen* factor, that the exclusive (primary) use of its property is for charitable purposes, MPG argues that the use of its property was essential to the purpose of dispensing medical care to all who needed it and that the efficient administration of MPG was vital to providing medical services to all who were in need. Defendants argue that MPG stated on all of its applications for exemptions that the property was used exclusively to house the executive and administrative employees necessary to operate MPG and, therefore, existed primarily to benefit its physicians. Defendants further argue that the creation and dissemination of invoices to paying customers and the administration of employee benefits have nothing to do with providing charity to indigent patients.

The trial court found, and we agree, that the primary use of MPG's property was not charitable in nature because no treatment or medical research took place on the property. As the trial court noted, the property was used by a for-profit medical practice plan for the primary purposes of billing patients and collecting debts. We further find *Lutheran General* distinguishable because, in that case, the property was used for medical research, patient treatment and teaching. Accordingly, we find that the exclusive use of MPG's property was not for charitable purposes.

In summary, because MPG failed to meet any of the six guideline factors for determining whether it was entitled to a charitable tax exemption, and it clearly did not exclusively use its property for charitable purposes and it was not owned by a charitable organization, we find that the trial court did not err in denying it a charitable purposes exemption.

MPG next contends that it satisfied the requirements for a school exemption because its property "is used exclusively for the administration of the medical practice plan" for physicians who "comprise the core, clinical faculty" at Midwestern University. MPG also argues "that the administrative functions performed on the subject property are vital to the efficient administration of the clinical faculty" at Midwestern University. MPG asserts that Midwestern University "could not train medical students to become physicians, and the Medical Centers could not train interns and residents, or treat patients—indigent and otherwise—without a clinical faculty." MPG argues that it should not be denied a school exemption simply because it was forced to move its administrative office off-site when Midwestern University needed the space. MPG lastly asserts that it is the "life-blood" of Midwestern University and it is irrelevant that no teaching takes place on the property.

The Department contends that "the primary use of the property is to support the purposes of MPG, which is, *** to benefit its shareholders." The Department argues that the benefit to MPG shareholders was profit. The board of education contends that MPG did not meet the primary use test for a school exemption because the property was used exclusively for the executive and administrative functioning of MPG. The Department and the board of education also argue that since the property was owned by MPG, a commercial enterprise, MPG was not entitled to a school exemption. The board of education further argues that since no educational activities were conducted on the property, and the actual use of the property is determinative of whether the property is entitled to a school exemption, MPG was not entitled to the exemption.

■ Section 15—35 of the Tax Code (35 ILCS 200/15—35(c) (West 1996)) provides a tax exemption if property is "used for" a public university "or other educational purposes," but does not define the scope of those terms. In determining whether a property is entitled to a school exemption, courts have considered two main factors: (1) whether the property contained a school that offered an established or commonly accepted program; and (2) whether the program in question substantially lessened what would otherwise have been a governmental obligation. *Chicago & Northeast Illinois District Council of Carpenters Apprentice & Trainee Program v. Department of Revenue*, 293 Ill. App. 3d 600, 608-10, 688 N.E.2d 721 (1997). Courts also consider the additional factors of the duration of the course of study, whether classroom instruction was given, and if degrees or diplomas were given out. *Chicago & Northeast*, 293 Ill. App. 3d at 610.

In the present case, MPG does not contend that it is a school, but

argues that since Midwestern University is a school to which a school tax exemption would apply, and MPG is performing the same functions that Midwestern University could, the exemption should apply to the activities performed by MPG.

■ "[T]he statute [pertaining to property used for educational purposes] is written in the disjunctive: property *may be exempt if used as a school or for 'educational purposes.'*" (Emphasis in original.) *Illini Media Co. v. Department of Revenue*, 279 Ill. App. 3d 432, 435, 664 N.E.2d 706 (1996). "The taxable status of property is not determined solely or necessarily by whether the owner or operator is a school." *Ass'n of American Medical Colleges v. Lorenz*, 17 Ill. 2d 125, 127, 160 N.E.2d 763 (1959). A party seeking a tax exemption for property used for educational purposes must show that the property is used exclusively for school purposes. *MacMurray College v. Wright*, 38 Ill. 2d 272, 278, 230 N.E.2d 846 (1967). "The primary use of the property, not its incidental uses, determines its tax exempt status." *Wright*, 38 Ill. 2d at 278. "If the primary use is for the production of income 'with a view to profit,' the tax-exempt status is destroyed." *Northern Illinois University Foundation v. Sweet*, 237 Ill. App. 3d 28, 37, 603 N.E.2d 84 (1992).

■ Here, the trial court found that MPG's "property is owned by a for-profit corporation" and its "primary use is the operation of a private medical practice plan." The trial court also determined that there was "no educational use made of the property" and the property's use was not related to the efficient administration of Midwestern University or COHS. We agree with the trial court. There is nothing student-related performed by MPG, nor are any essential services provided for the students by the activities conducted on MPG's property. The property is used exclusively for the administrative purpose of running MPG and houses the administrative personnel of MPG. The activities that take place on the property are the billing, collection, data processing, accounting, administration, management, payroll and other related functions to operate MPG. Moreover, MPG is not affiliated with Midwestern University and MPG's relationship with the university is defined in a contract that characterizes MPG as an "independent contractor." Accordingly, MPG's property was not used primarily for educational use.

We briefly note that MPG's reliance on *Lorenz*, in support of its school tax exemption argument, is misplaced. *Lorenz* is distinguishable from the facts of the case at bar. In *Lorenz*, the members of the Association of American Medical Colleges were United States medical schools and the property in question was used to compile student information to help improve educational standards at various medical

schools, which was used for the essential services of the students who were to be enrolled in an academic program. The property was also used to publish a journal and directory showing admission requirements and other information about medical schools; compile student information to assist medical schools in developing programs of instruction; sponsor admission tests and teaching institutes; evaluate students' intellectual and personality characteristics and their relationship to scholastic and professional performance; maintain a library of motion picture files for the medical schools; perform a placement function; and appraise the curricula of medical schools and colleges. *Lorenz*, 17 Ill. 2d at 126-27. Here, the activities on MPG's property were not comparable to the activities that took place on the property in *Lorenz*, *i.e.*, billing, collection, data processing, accounting, administration, management, payroll and related functions to operate MPG. The fact that some educational use was made of the property does not qualify MPG for a school tax exemption since, as discussed above, its primary use was not tax-exempt. See *Sweet*, 237 Ill. App. 3d at 37 (property used occasionally by a Northern Illinois University organization for conferences and retreats was not entitled to a school tax exemption because the primary use of the organization was the rental of the property's facilities to any outside group); *Yale Club v. Department of Revenue*, 214 Ill. App. 3d 468, 473, 574 N.E.2d 31 (1991) (recruiting and fund-raising activities in behalf of an out-of-state private school, although beneficial to an educational institution, did not qualify the plaintiff for a school tax exemption); *DePaul University, Inc. v. Rosewell*, 176 Ill. App. 3d 755, 757-58, 531 N.E.2d 884 (1988) (tennis facilities owned and used by DePaul University, but rented primarily to a private club, were held to be nonexempt property because they were not used primarily for school purposes even though revenue was applied to school programs). MPG's use of its property was much different than that of the property in *Lorenz*; the record here clearly shows that MPG's property was primarily used for MPG.

We also reject MPG's argument that, without MPG's administrative office, Midwestern University could not continue to exist. MPG, beyond this mere assertion, failed to present any evidence in support of this argument. To the extent that the property is used for any educational purposes, that use was incidental. Accordingly, we hold that the trial court did not err in finding that MPG was not entitled to a school tax exemption.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.