Second Division

June 30, 1997

No
. 1-96-1735

INSTITUTE OF GAS TECHNOLOGY, )  Appeal from the

)  Circuit Court of

Plaintiff-Appellant, )  Cook County.

)

v. )  

)

THE DEPARTMENT OF REVENUE, )  Honorable

)  George Smith,

Defendant-Appellee. )  Judge Presiding.

JUSTICE RAKOWSKI delivered the opinion of the court:

Plaintiff, Institute of Gas Technology (IGT), appeals from an order confirming the decision of the Department of Revenue (the Department) that denied IGT's 1993 application for a charitable real estate tax exemption.  We affirm.

FACTS

IGT is a not-for-profit Illinois corporation that conducts research and education in the energy and environmental fields.  It has no shareholders or capital stock, pays no dividends, and its directors are not compensated.  It generally shows no profit at year end.  IGT has been granted a section 501(c)(3) federal tax exemption (26 U.S.C. §501(c)(3) (1994)), and exemptions under Illinois law for retailers occupation tax (35 ILCS 120/1 
et
 
seq
. (West 1994)), use tax (35 ILCS 105/1 
et
 
seq
. (West 1994)), service occupation tax (35 ILCS 115/1 
et
 
seq
. (West 1994)), and service use tax (35 ILCS 110/1 
et
 
seq
. (West 1994)), because it is organized and operated exclusively for educational purposes.

IGT conducts research in the natural gas industry and seeks to develop alterative energy sources to compete with natural gas to provide the public with a broader base of energy choice.  Two examples of its research are the fuel cell energy system and processes to turn Illinois' abundant coal into a form of useable energy.  The fuel cell method is an advanced form of electricity generation.  It is highly efficient, has almost zero emission, and makes almost no noise.  Additionally, it is employable in small incremental units so there is no need for a central power station.  IGT also developed a strain of bacteria that converts coal into a vaporous form of fuel.  The resulting vaporous form is a clean gas that can be used to generate electricity.

Bernard S. Lee, president of IGT, testified that IGT does not respond to bids for projects but instead develops concepts and then solicits funding.  According to Lee, IGT's scientists and engineers generate a concept.  They then utilize limited, in-house funding to perform preliminary research to ascertain whether the concept is viable.  If the concept is found viable, IGT then seeks funding to further develop the project.  Lee stated that 95% to 98% of IGT's funding comes from solicited sponsorship.  He also testified that IGT conducts 85% of its research for nonmembers.

IGT derives revenue from two sources: (1) sponsored research and (2) "other" sources, including membership dues, course fees, royalty income, and miscellaneous income.  Total revenue in 1993 was $22,077,800; $14,953,900 (68%) in sponsored research and $7,123,900 (32%) in "other" revenue.  In 1993, IGT showed a net loss of $240,000.

IGT does grant licenses and patents for some of its research.  Lee testified that IGT first exhausts all nonexclusive avenues to disseminate a concept before granting a license or patent.  Only when there is no alternative method to ensure development for an ultimate public use does IGT grant an exclusive license.  Lee also testified that patents are sometimes granted to protect the concept itself.  In some instances, if a patent is not granted, the concept could fall into the hands of other entities and its benefit might not ultimately fall upon the public.  Additionally, Lee stated that patents are a means to fund research necessary to carry a project forward.

Lee testified that all of its research results are published and made available to the public.  Government research projects are submitted to the National Technical Information Service for publication.  This organization makes the publications available to the public for the cost of handling.  IGT's staff publishes other research results in journals, magazines, and public forums.  Additionally, the results are available at IGT's library, open to the public, and on its database.  Finally, IGT responds to public requests for information at no charge.

ANALYSIS  

I.  STANDARD OF REVIEW

Exemption statutes are to be strictly construed in favor of taxation.  
Chicago Patrolmen's Ass'n v. Department of Revenue
, 171 Ill. 2d 263, 271 (1996).  All facts and debatable questions are to be resolved in favor of taxation.  
City of Chicago v. Illinois Department of Revenue
, 147 Ill. 2d 484, 491-92 (1992).  The party seeking the exemption has the burden of proving by clear and convincing evidence that it is entitled to the exemption.  
Chicago Patrolmen's Ass'n
, 171 Ill. 2d at 271.  Each claim for exemption is to be evaluated from the facts present in the case.  
Chicago Patrolmen's Ass'n
, 171 Ill. 2d at 271.  "Whether an institution has been organized and is operating exclusively for a purpose exempt from real estate tax is to be determined from its charter and bylaws and the actual facts relating to its method of operation."  
Du Page County Board of Review v. Joint Comm'n on Accreditation of Healthcare Organizations
, 274 Ill. App. 3d 461, 466 (1995). 

"The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct."  735 ILCS 5/3-110 (West 1994).  Accordingly, the reviewing court's function is limited to determining whether the Department's decision is against the manifest weight of the evidence.  
Wyndemere Retirement Community v. Department of Revenue
, 274 Ill. App. 3d 455, 459 (1995).   However, when the facts are undisputed, the question of whether property is exempt is a question of law.  
Chicago Patrolmen's Ass'n
, 171 Ill. 2d at 271.  Then, "the decision as to whether property is exempt depends solely upon the application of the appropriate legal standard to the undisputed facts."  
Du Page County Board of Review
, 274 Ill. App. 3d at 467.  In other words, the question is whether the circuit court properly found that the property in question was not entitled to tax-exempt status.  
Lutheran General Health Care System v. Department of Revenue
, 231 Ill. App. 3d 652, 660 (1992).

The only disputed question in the instant case is whether IGT's research confers a direct benefit to an indefinite number of people or whether the benefit falls primarily on the sponsors and only indirectly on the public.  Because this is a disputed inference to be drawn from undisputed facts, the manifest weight of the evidence standard applies.

II. EXEMPTION STATUS

Initially, we note that plaintiff does not contend that, because it possesses a federal exemption and Illinois exemptions for retailers occupation tax, use tax, and service taxes, it is therefore entitled to a real property tax exemption.  In fact, it admits otherwise and quotes: "But these exemptions [federal and Illinois sales and use tax] do not 'furnish material facts about exclusive charitable use of property under our constitution,' [citations] and the existence of such exemptions is not determinative of the issue before us [charitable property tax exemption]."  
People ex rel. County Collector v. Hopedale Medical Foundation
, 46 Ill. 2d 450, 464 (1970).

Pursuant to the Illinois Constitution's grant of power authorizing the legislature to exempt certain property from taxation (Ill. Const. 1970, art. IX, §6), the legislature adopted what was then identified as section 19.7 of the Revenue Act of 1939. 35 ILCS 15/-65 (West 1994).  This section states, in pertinent part:

"All property of the following is exempt when actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit:

(a) institutions of public charity."  35 ILCS 200/15-65 (West 1994).

Two elements are required to entitle a parcel to exemption: charitable use and ownership by a charitable organization.  
Chicago Patrolmen's Ass'n
, 171 Ill. 2d at 270.

The Department determined that IGT was not entitled to an exemption because: (1) it presented no evidence that a sliding fee scale was ever applied; (2) it presented no evidence that it discharged any debt; and (3) its benefits were restricted to those who could afford royalty payments and the benefits were not available to an indefinite number of people.

In confirming the Department's decision, the circuit court noted that IGT was not entitled to the exemption since it failed to demonstrate that its purpose was for charity.  In agreeing that the public benefitted only indirectly, the court stated:

"While it appears that the federally funded research could be conceived to provide incidental public benefit, this benefit, more exactly, flowed to corporations within the public domain.  The benefit from research funded by other sources inured to an even more restricted group, those comprised of providing the funding.  The fact Taxpayer's research information was published and made available does not confer a benefit to an indefinite number of persons when the majority of, Taxpayer's resources were devoted to industry specific applications and generally made available for contributing members."

In addition, the court stated that since some private entitles were given a share of royalty income, the benefit of the research inured to the private entities, not the general public.  The circuit court found that 
North Star Research Institute v. County of Hennepin
, 306 Minn. 1, 236 N.W.2d 754 (1975) (discussed below), was both factually similar and persuasive.

In 
Methodist Old Peoples Home v. Korzen
, 39 Ill. 2d 149 (1968), the Illinois Supreme Court outlined the following criteria in evaluating whether property is exempt from taxation based on a charitable use:

" '(1) the benefits derived are for an indefinite number of persons [for their general welfare or in some way reducing the burdens on government]; (2) the organization has no capital, capital stock or shareholders, and does not profit from the enterprise; (3) funds are derived mainly from private and public charity, and the funds are held in trust for the objects and purposes expressed in the charter; (4) the charity is dispensed to all who need and apply for it; (5) no obstacles appear to be placed in the way of those seeking the benefits; and (6) the exclusive (primary) use of the property is for charitable purposes.' "  
Vermilion County Museum Society v. Department of Revenue
, 273 Ill. App. 3d 675, 678 (1995), quoting 
Decatur Sports Foundation v. Department of Revenue
, 177 Ill. App. 3d 895, 900 (1988), citing 
Methodist Old Peoples Home
, 39 Ill. 2d at 157.

At the onset, we agree with 
Du Page County Board of Review
 that the 
Methodist Old Peoples Home
 factors are guidelines and not definitive requirements.  
Du Page County Board of Review
, 274 Ill. App. 3d at 468.  "A review of 
Methodist Old Peoples Home
, together with the Illinois case law that interprets it, confirms that our supreme court did not intend to have these factors used as requirements for assessing an institution's charitable status.  Instead, these factors were to be used as guidelines for such an assessment."  
Du Page County Board of Review
, 274 Ill. App. 3d at 468.  Thus, a rigid formula is not to be applied to all fact situations but instead "courts consider and balance the guidelines by examining the facts of each case and focusing on whether and how the institution serves the public interest and lessens the State burden."  
Du Page County Board of Review
, 274 Ill. App. 3d at 469.

No cases in Illinois address the issue of whether a research institute such as IGT serves a charitable purpose and none of the cases we have found are factually similar.  Although the parties cite numerous cases in support of their positions, none involves an entity comparable to IGT with the exception of 
Gas Research Institute v. Department of Revenue
, 154 Ill. App. 3d 430 (1987).   
Gas Research Institute
, however, is not particularly helpful since the nature of the entities and their functions are different.  Gas Research Institute (GRI) was a not-for-profit company funded by a federally authorized surcharge on interstate pipeline transfers that was passed along to consumers.  GRI's stated purpose was "funding, encouraging, and conducting research and development of natural gas resources and uses."  
Gas Research Institute
, 154 Ill. App. 3d at 432.  It was organized and operated solely by members of the gas industry.  The court denied a charitable sales tax exemption to GRI, finding that it failed to benefit the public generally.  Although the public was benefitted by GRI's efforts to make natural gas more appealing, the court found that this benefit was indirect and not primary or substantial.  
Gas Research Institute
, 154 Ill. App. 3d at 437.  Instead, GRI's primary purpose was to "enhance the position of natural gas in the energy marketplace."  
Gas Research Institute
, 154 Ill. App. 3d at 436.  IGT, however, is not operated by or for any particular industry.  It does research in various industries and is funded from numerous sources, unlike GRI, which was funded solely by the gas industry.  The fact GRI was denied a sales tax exemption and IGT possesses a sales tax exemption does not command a finding that IGT is consequently entitled to a charitable property tax exemption.  The basis for GRI's sales tax exemption was a charitable purpose while the basis for IGT's sales tax exemption was an educational purpose.  The elements necessary to sustain an exempt status based on educational purposes are different from those required to sustain an exempt status on charitable purposes.  
Yale Club v. Department of Revenue
, 214 Ill. App. 3d 468, 474 (1991); 
American College of Chest Physicians v. Department of Revenue
, 202 Ill. App. 3d 59, 64 (1990).  Moreover, simply because an entity is entitled to one type of exemption does not necessarily signify it is entitled to another type of exemption.  See, 
e.g.
, 
Gas Research Institute
, 154 Ill. App. 3d 430 (although institute granted an Illinois income tax exemption, sales tax exemption denied).

Two other jurisdictions have addressed the tax-exempt status of research institutes, although involving personal property tax exemptions.  In 
North Star Research Institute
, cited by both parties and the circuit court, the Minnesota Supreme Court denied a personal property tax exemption after determining that North Star was not undertaking a charitable activity.  North Star was a nonprofit corporation and generally realized no year-end profits.  It undertook research in various areas from commercial use of waste products to billing and accounting procedures.  It performed research at the request of its clients, who defined the scope of the research.  North Star's objective was "to put the benefits of research to the purposes of commerce."  
North Star Research Institute
, 306 Minn. at 7, 236 N.W.2d at 757. 

The 
North Star
 court analyzed numerous cases in rendering its decision and found two distinct characteristics of North Star that precluded an exempt status: its activities did not benefit the public generally and its information was not disseminated to the public.  In all cases allowing exemptions, "no person or corporation gain[ed] a profit or commercial advantage as the immediate and intended direct consequence of the 'charity.' "  
North Star Research Institute
, 306 Minn. at 7, 236 N.W.2d at 757.  North Star performed research at the request of private enterprises that were engaged in business for profit.  North Star's "concern [was] not to develop knowledge in the abstract, with possible indirect benefit to private enterprise, but instead to apply research tools to the particular problems of a particular business enterprise for the specific purpose of developing data or processes which [could] be turned into a profit for the beneficiary of the information."  
North Star Research Institute
, 306 Minn. at 7, 236 N.W.2d at 757-58.  Accordingly, because North Star's objective was to put the benefits of its research to the purposes of commerce, the court determined that the clients benefitted; North Star's activities did not directly benefit the public.  The court also noted that the activities undertaken by North Star, unlike in cases awarding exemptions, were not in areas that the federal or state government historically supported with public funds.

A second characteristic of North Star's activities was that the information developed was not made available to the public generally.  Instead, the research became the exclusive property of the enterprise for which the research was conducted.  Although noting that other cases have allowed exemptions, the 
North Star
 court stated "but in each instance emphasis was placed on the circumstances that the data, information, and publicity generated by the organization *** were made available to the people generally, or at least such segments of the public as might have an interest in the subject matter."  
North Star Research Institute
, 306 Minn. at 15, 236 N.W.2d at 761.   In contrast, North Star operated in "large measure as a business for the benefit and financial advantage of commercial enterprises."  
North Star Research Institute
, 306 Minn. at 11, 236 N.W.2d at 759.  

In summary, the court stated:

"If it is possible to derive a principle from the other cases mentioned, it would be that a claim for tax exemption by an organization engaged in research in whole or in part, may be viewed sympathetically by the courts, depending on whether the entity involved makes the product of its research efforts available to the public generally.  If access to the information generated by the study and research is limited in whole or in significant part to the commercial advantage of the person receiving it, and that is the case here, exemption will probably be denied, particularly in situations where the determinative language is 'a purely public charity' or words of like import."  
North Star Research Institute
, 306 Minn. at 16, 236 N.W.2d at 762.

Eyring Research Institute v. Tax Comm'n
, 598 P.2d 1348 (Utah 1979), also involved a personal property tax exemption.  The Utah Supreme Court denied the exemption, finding the entity was not sufficiently devoted to a charitable purpose.  In 
Eyring
, 96% of the entity's work was for the government; the remaining 4% was for private organizations.  Research was conducted in various fields including protection of government missiles while in flight, development of a feasible coal gasification process, creation of highway safety barriers, improvement of water quality, and development of a ski resort.  The research was generally available to the public after it was provided to the client.  However, Eyring would withhold dissemination if a private client requested.  In reaching its decision, the court deemed this factor rather significant:

"However, the record fails to demonstrate that Petitioner's function as a disseminator of knowledge is paramount to its chief preoccupation, which is the satisfaction of its individual customers."  
Eyring Research Institute
, 598 P.2d at 1350.

In reasoning that Eyring was not a charitable organization, the court outlined the following factors.  First, one-half of its research was for the government and involved areas that are not recognizable as charities.  Second, Eyring's efforts were focused on a finite, ascertainable number of individual clients and its public benefit was only incidental.  Eyring's discoveries reached the public only when and if the client passed them on through commerce.  Third, Eyring would restrict disclosure of its research at its client's request.  Finally, Eyring's function in disseminating information was not its primary purpose.  
Eyring Research Institute
, 598 P.2d at 1351.

The 
Eyring
 court, although noting that the definition of "charity" was taking on "multifarious forms," stated that "the more remote the objects and methods become from the traditionally recognized objects and methods the more care must be taken to preserve sound principles and to avoid unwarranted exemptions from the burdens of government."  
Eyring Research Institute
, 598 P.2d at 1352.

Although neither 
North Star Research Institute
 nor 
Eyring Research Institute
 is binding upon us, we find their analyses persuasive.  The most prominent factors to be gleaned from the cases relative to evaluating research institutes in the context of charitable exemptions are: (1) Is the institute's research available to the public? and (2) Who directly benefits from the institute's research efforts, taking into consideration the ability of the research to reduce governmental burdens and the remoteness of the nature of the research from traditional notions of charities?

There is no question in the instant case that IGT's information is available to the public or at least to that sector of the public that is interested.  The ultimate issue, however, as agreed to by the parties, is, Who directly benefits from IGT's research?

Lee testified that IGT had in place a sliding fee scale for its courses and would forgive a debt should a party be unable to pay.  Initially, we note that these provisions are contained only in the bylaws and not in the course schedules, applications, or contracts.  Thus, members of the public and even sponsors would not be aware of the waiver provisions unless they read the bylaws.  In 
Du Page Art League v. Department of Revenue
, 177 Ill. App. 3d 895, 900 (1988), the fact that the waiver provisions were not contained in the public brochures or on the application forms was found to be relevant in denying an exemption.  Moreover, IGT presented no evidence it had ever reduced a fee for any person or entity or that it had forgiven a debt.  Accordingly, there is evidence from which the Department could determine that obstacles to the benefits exist.

As to who directly receives the benefits of IGT's research, the record contains evidence from which the Department could determine that the general public was not directly benefited.  In this regard, we see no viable distinction between the fact that IGT solicits funds to sponsor research and that, in the aforementioned cases, the research was requested.  It is reasonable to conclude that, if IGT's sponsors did not expect a direct benefit from the research and development, they would not be willing to furnish funds to IGT.  While it is true that some funds are given to IGT without strings attached (sustaining members dues), there is evidence that IGT's sponsors reap the direct benefits of the research efforts.  The sponsors directly benefit, since they may eventually place the development in the stream of commerce or apply it in their own companies for better energy efficiency or enhanced progress.

While we agree that IGT's research projects could benefit an indefinite number of people if a viable alternative energy resource is developed, we find it hard to say at this time that the direct benefit is to the public.  The only way the public could utilize the development is if it is channeled through commercial means by the sponsors.  However, by channeling the development through commerce, its sponsors themselves directly benefit via the revenues they would make.  In this regard, 
North Star Research Institute
 is instructive:

"It is true of course that a public advantage is achieved ultimately whenever a process is discovered which makes it possible to produce goods or services more efficiently and economically than would otherwise be the case.  But this public benefit is an indirect one and is not the immediate objective of [North Star's] undertaking."  
North Star Research Institute
, 306 Minn. at 7-8, 236 N.W.2d at 758.

As in 
North Star
, one of IGT's missions is ultimate commercialization of the concept and it admits this purpose.

Finally, we concur with those courts that have focused upon the particular activity involved to determine its remoteness from traditional notions of charity and whether the activity is one the government has historically supported.  We note that most decisions have dealt with activities that are traditionally considered charitable.

"In all of these situations *** the activity involved is one which our state and Federal governments have historically supported with public funds.  Government programs for relief of poverty, care for the sick and aged, and the education and training of young people have been long and widely accepted.  It can be said with respect to activities that are traditionally 'charitable' that ultimately people will benefit in an economic sense from the charitable undertaking.  Persons relieved from poverty and illness and the restraints of old age demand less of, and contribute more to, the economic well-being of a community than do those who are not so relieved.  A person who receives the benefits of an education, whether theoretical or practical, may add more to the well-being of a society than one who is not so advantaged.  It has been recognized that religious education and training add to the moral strength of a community."  
North Star
, 306 Minn. at 7, 236 N.W.2d at 757.  

The research in 
North Star
 was not the type traditionally recognized as charitable and the court determined that the research possessed characteristics that distinguished it from those types of research recognized as charitable.  IGT's research is akin to that in 
North Star
 and 
Eyring
; it is the sort that is not recognized as a traditional charity.

While we acknowledge that the definition and concept of "charity" are continually evolving, we agree with 
Eyring
 that the further away from traditional notions of charity the activity is, the more exacting the courts must view the activity.

"We are sensitive to the multifarious forms which acts of charity may assume.  ***

***

'Notwithstanding the law's acknowledgement of the manifold new forms in which charity may find expression, the more remote the objects and methods become from the traditionally recognized objects and methods the more care must be taken to preserve sound principles and to avoid unwarranted exemptions from the burdens of government.' "  
Eyring
, 598 P.2d at 1351-52, quoting 
Boston Chamber of Commerce v. Assessors of Boston
, 315 Mass. 712, 718, 54 N.E.2d 199, 202, 152 A.L.R. 174, 179 (1944).

Each claim must be evaluated on its own facts and we should not apply a rigid formula but instead should "consider and balance the guidelines by examining the facts of each case and focusing on whether and how the institution serves the public interest and lessens the State burden."  
Du Page County Board of Review
, 274 Ill. App. 3d at 469.  

CONCLUSION

Based on the above, we conclude that plaintiff failed to meet its burden of proving its exempt status by clear and convincing evidence.  Accordingly, the decision of the circuit court of Cook County is affirmed.

Affirmed.

DiVITO, P.J., and TULLY, J., concur.