THE ARTS CLUB OF CHICAGO, Plaintiff-Appellant, v. THE DEPARTMENT OF REVENUE, Defendant-Appellee.

First District (6th Division)    No. 1—01—1633

Opinion filed September 27, 2002.

Thomas M. Tully & Associates, of Chicago (James A. Hullihan, Bridget J. Hughes, and John T. Casey, of counsel), for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Erik G. Light, Assistant Attorney General, of counsel), for appellee.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiff, the Arts Club of Chicago (the Club), filed this administrative review action after defendant, the Department of Revenue (the Department), adopted the recommendation of an administrative law judge (ALJ) denying a 1995 property tax exemption for real property in Chicago owned by the Club. The circuit court affirmed the Department's decision, and the Club now appeals, contending that it is entitled to a charitable exemption.

## BACKGROUND

The Club was organized in 1916 to bring modern and avant-garde art to Chicago and to provide a place where "art lovers could meet art makers." The purposes of the Club, as stated in its articles of incorporation amended on June 7, 1993, include "[t]o encourage, foster, promote and sponsor activities and presentations which would aim to increase public interest in the arts and related activities" and "[t]o expand the artistic horizons of a public interested in arts." The Club makes available to the public art and literary works not available at other museums. The Club focuses on presenting shows and exhibits that larger museums would not present, has showcased the work of many painters whose works have never been exhibited in Chicago, and actually hosted Pablo Picasso's first show in the United States. The Club has made the works of other artists and literary figures such as Alexander Calder, Carl Sandburg, and Constantin Brancusi available to the public. The Club promotes and sponsors all of the arts, including music and theater, and periodically presents concerts, lectures, and performances.

From the early 1950s until the mid 1990s, the Club leased and occupied space in a building at 109 East Ontario Street. In 1995, after learning this building was to be demolished, the Club purchased land at 201 East Ontario Street and began constructing a two-story building there. To fund the construction of the new building, which is approximately 19,400 square feet, the Club issued bonds. To fund the purchase of the land for the building, the Club sold the "Golden Bird," a sculpture by Brancusi, to the Art Institute for $12 million. The Club originally bought the "Golden Bird" with donated funds in 1927 for $1,200. The Club created an endowment fund with the proceeds from the sale of the "Golden Bird" which remained after it purchased the land for the new building and now uses the investment income generated by that fund to finance current operations. The new building

opened in April 1997, and during its construction, which began in 1995, the Club operated out of a temporary location.

The first floor of the Club's building has two galleries, which are used for temporary exhibitions, an office, a library, restrooms, a small dining room, and a "green room," which is used by performing artists to get ready before their performances. A steel staircase designed by Mies van der Rohe and originally located in the building formerly used by the Club occupies the center of the building. The staircase is set in a travertine marble well or "box" and is accessible through glass double doors. The second floor of the building has a reception area, an auditorium that can accommodate approximately 200 people, a stage for musical events and lectures, a dining room, and a kitchen. The dining and kitchen areas comprise approximately 14% of the building's total area.

The Club has a permanent collection of approximately 100 pieces that has been acquired primarily through donations by collectors and artists. About 90% of the permanent collection is displayed in various areas of the Club, including the green room, the small dining room, the library, and the restrooms on the first floor, and the dining room, reception area, and auditorium on the second floor.

The Club is open to the public at no cost Monday through Friday, 11 a.m. to 6 p.m., and Saturday, 11 a.m. to 4 p.m. A sign on the front door states "Exhibition Open to the Public." The Club advertises that it is free of charge by issuing press releases to various local magazines and newspapers. The Club contacts schools in the area to encourage students to come and view its artwork free of charge. Each year the Club holds five two-month exhibitions in its two first-floor galleries. There is no charge to view these exhibitions, which include sculpture, painting, film, and video. Once every two years, the Club hosts an exhibit displaying the artwork of members.

In addition to these exhibits, the Club sponsors new music programming, lectures, performances, and discussions. These programs are held each year in the auditorium on the second floor. Notices in local newspapers, magazine advertisements, and press releases sent to over 100 organizations are used to promote the programs, which are open to the public and are usually held in the evening. Approximately half of the programs are free while there is a $10 admission fee for the other half. According to Kathy Cottong, the Club's director, the fee for these programs is routinely waived for students and others who tell the door attendant that they genuinely want to attend the program, but are unable to pay the admission fee.

The Club's dining room is open for lunch Monday through Friday, 12 p.m. to 2 p.m. Although only Club members and their guests are al-

lowed to eat in the dining room, nonmembers may view the permanent collection located there during any time the building is open to the public. The Club charges for food, but it does not generate a profit through the operation of the dining room. Members may have private parties in the dining room and may sponsor a nonmember for a private party during hours when the Club is not open to the public. The rental fee charged by the Club for parties is used to cover the cost of security, utilities, and some of the staff's salary, and does not generate a profit for the Club.

The Club's attendance figures for the period of April 1997 through November 1999 show that there were 4,337 visitors in the "Walk In/ Students" category and 68,063 visitors in the "Dining/Events/Parties" category. The former category includes student groups and the public who viewed the galleries and exhibitions. The latter category includes those who came to use the dining room, to attend a public event, or to attend a private party.

The Club has a 50-member board of directors and an executive committee consisting of 8 to 10 board members who are responsible for the financial aspects of the Club as well as membership. Both board members and members of the executive committee serve without compensation or reimbursement for expenses. The Club also has a chairman, vice-chairman, president, treasurer, and secretary, who together oversee the daily operations of the Club. These officers also serve without pay or reimbursement for expenses. In addition, the Club has salaried employees, including the Club's director Kathy Cottong and the Club's chef and sous chef.

During 1995 and 1996 Cottong served as the Club's artistic director and was responsible for exhibitions and artistic programming. Her 1995 salary was $55,000, and her 1996 salary was $57,000. Cottong's title subsequently changed to "director," and her responsibilities were expanded to include management and oversight of the dining facility and the Club's finances. In 1999, Cottong received a $10,000 bonus for working on the Club's accounting procedures and computer system, and in 2000 her salary was "a little bit higher" than it had been in 1996. In 1995, the salary of the Club's chef was approximately $53,000, and in 1999 the chef received a $10,000 bonus for "controlling costs and operations." The salaries of the Club's employees are paid out of the operating budget, the majority of which is derived from investment income.

In order to become a member, an applicant must be sponsored by a member and seconded by two members who know the applicant personally. In addition, the sponsor and one of the seconders must write letters of recommendation on behalf of the applicant. The

membership committee then votes on the applicant; a single negative vote precludes the applicant from becoming a member.

In 1995, the Arts Club had approximately 849 members. Although the Club has several different classes of members, they all fall into two general categories: lay and professional. Lay members include arts supporters, advocates, and collectors; professional members include literary, visual, and performing artists. While lay members pay an $800 initiation fee and yearly dues of $800, professional members pay an initiation fee of between $250 and $400 and yearly dues of between $250 and $400. The Club's bylaws allow the membership committee to confer a "special membership" which waives membership fees in instances where it determines that "strict application of the rules would work a hardship or would not be feasible." Special memberships are not listed on the membership application and are subject to veto by the Club's president.

The Arts Club has no capital stock, no shareholders, and pays no dividends to any of its members and is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. § 501(c)(3) (1994)). An exhibit introduced into evidence at the hearing before the ALJ indicates that for the year which ended on September 30, 1996, the Club derived its funds as follows: 25% from "Dues and Fees," 2% from "Food Service Revenue," and 73% from "Investment Income." The exhibit indicates that for the year which ended on September 30, 1997, these figures were 11%, 9%, and 80%, respectively.

In June 1996, the Club submitted to the Department an application for a property tax exemption for 1995 for its building at 201 East Ontario. The Department denied the application in April 1997 and determined that the property was neither in exempt ownership nor in exempt use. In January 2000, at the Club's request, a hearing was held before an administrative law judge on the issue of whether the subject property should be exempt from real estate taxes for 1995. The Department's case consisted of the Club's application and the Department's denial of the application. During the administrative hearing approximately 30 exhibits were admitted into evidence, including the Club's articles of incorporation, amendments, bylaws, audited financial statements for 1995, and the application for tax-exempt status. The Club presented the testimony of three witnesses: Richard Christiansen, a member of the Club's board of directors; Stanley Freehling, the Club's president; and Kathy Cottong, the Club's director.

On April 6, 2000, the ALJ issued his "RECOMMENDATION FOR DISPOSITION," in which he recommended the Department affirm its

earlier denial of the Club's exemption application. The ALJ initially observed that "[t]he issuance of the building permit on October 2, 1995, show[ed] that the project had gone beyond a mere intention to convert the property, and actually constituted development and adaptation of the property for exempt use." After concluding that the Club's property was in actual development and adaption for exempt use in October 1995, the ALJ addressed whether the Club qualified as an "institution of public charity." The ALJ concluded that the Club did not qualify as an institution of public charity and made several findings in support of that conclusion.

The ALJ first found, based on the Club's membership structure and application process, that the Club did not dispense charity to all those who needed it and placed obstacles in the way of those who applied for its charitable benefits. In addition, the ALJ found, based on the relatively low number of visitors who qualified as "Walk In/ Students" and the fact that nonmembers may not eat in the dining room, that the Club did not extend its benefits to an indefinite number of persons. The ALJ next found that the Club provided a gain or profit in a private sense to some persons connected with it. In support of this finding, the ALJ noted the absence of evidence indicating that the salaries of the Club's director and chef were reasonable and the fact that only members were allowed to display their work at the "members exhibition" held every couple of years. Finally, the ALJ found that the Club did not derive its funding from charitable sources based upon the fact that he was unaware of any legal support for the Club's argument that "the appreciation of a donated asset becomes a donation in itself." The ALJ acknowledged there was some evidence supporting the Club's contention that it was a charitable organization but concluded that, on balance, it failed to prove that status clearly and convincingly.

On April 10, 2000, the Department accepted the ALJ's recommendation, and on May 12, 2000, the Club filed an administrative review complaint in the circuit court.

On April 5, 2001, the trial court affirmed the Department's decision.

## STANDARD OF REVIEW

■ At the outset, we note that we are required to review the Department's decision rather than the circuit court's decision. *Calabrese v. Chicago Park District*, 294 Ill. App. 3d 1055, 1065 (1998). "An administrative agency's decisions on questions of fact are entitled to deference and are reversed only if against the manifest weight of the evidence." *Friends of Israel Defense Forces v. Department of Revenue*, 315 Ill. App. 3d 298, 302 (2000). We do not give deference to an

agency's decisions on questions of law, and we review such decisions *de novo. Friends of Israel Defense Forces*, 315 Ill. App. 3d at 302. However, when the facts are not in dispute and the only issue on appeal is the legal conclusion to be drawn from those facts, we review the agency's determination under the clearly erroneous standard. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998) (issue is a mixed question of law and fact subject to the clearly erroneous standard if it requires the reviewing court to examine "the legal effect of a given set of facts"); *Friends of Israel Defense Forces*, 315 Ill. App. 3d at 302-03 (applying clearly erroneous standard to review Department of Revenue decision denying request for property tax exemption); but see *Chicago Patrolmen's Ass'n v. Department of Revenue*, 171 Ill. 2d 263, 271 (1996) (whether property is exempt from taxation is a question of law when the facts are undisputed); *Lena Community Trust Fund, Inc. v. Department of Revenue*, 322 Ill. App. 3d 884, 886-87 (2001) (applying *de novo* review to Department of Revenue decision denying property tax exemption request and noting conflict among appellate court decisions regarding the applicable standard of review when the only issue is the legal conclusion to be drawn from undisputed facts).

■ "The clearly erroneous standard of review is between a manifest weight of the evidence standard and a *de novo* standard so as to provide some deference to the administrative agency's experience and expertise." *Friends of Israel Defense Forces*, 315 Ill. App. 3d at 303. Under this standard, we are required to accept the findings of the administrative agency "unless we are firmly convinced the agency has made a mistake." *Randolph Street Gallery v. Zehnder*, 315 Ill. App. 3d 1060, 1064 (2000). The facts here are undisputed. In the instant case, we are called upon to determine the legal effect of a given set of facts, and we therefore review the Department's decision under the clearly erroneous standard.

## ANALYSIS

■ "In determining whether property is included within the scope of a tax exemption, all facts are to be construed and all debatable questions resolved in favor of taxation." *Midwest Physician Group, Ltd. v. Department of Revenue*, 304 Ill. App. 3d 939, 952 (1999). The taxpayer claiming the exemption is required to prove clearly and convincingly that the property in question comes within the terms of the exemption. *Lena Community Trust Fund, Inc.*, 322 Ill. App. 3d at 888.

■ Section 15—65(a) of the Property Tax Code (Code) provides an exemption for property that is used for charitable purposes and states in relevant part:

"All property of the following is exempt when actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit:
  (a) institutions of public charity[.]" 35 ILCS 200/15—65(a) (West 1994).
"Two elements are required to entitle property to an exemption: exclusive use for charitable purposes and ownership by a charitable organization." *Midwest Physician Group, Ltd.*, 304 Ill. App. 3d at 953. "The term 'exclusive use' refers to the primary purpose for which the property is used, and not to the secondary or incidental purpose." *Midwest Physician Group, Ltd.*, 304 Ill. App. 3d at 953.

■ The Illinois Supreme Court provided guidelines for determining whether property is exempt from taxation based upon charitable use by a charitable organization in *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149, 156-57 (1968). These factors include: (1) the organization benefits an indefinite number of people for their general welfare or by reducing the burdens on government; (2) the organization has no capital, capital stock, or shareholders earning profits or dividends; (3) the organization derives its funds primarily through private and public donation and expends these funds for the purposes expressed in its charter; (4) the organization dispenses its benefits to all those who need and apply for them; (5) the organization does not offer profit or gain in a private sense to any individual connected with it; (6) the organization places no obstacles in the way of those seeking its benefits; and (7) the property is used primarily for charitable purposes. See *Korzen*, 39 Ill. 2d at 157.

The factors outlined by the supreme court in *Korzen* are guidelines rather than definitive requirements. *Institute of Gas Technology v. Department of Revenue*, 289 Ill. App. 3d 779, 784 (1997). "[C]ourts consider and balance the guidelines by examining the facts of each case and focusing on whether and how the institution serves the public interest and lessens the State burden." *Du Page County Board of Revenue v. Joint Comm'n on Accreditation of Healthcare Organizations*, 274 Ill. App. 3d 461, 469 (1995). We note that the provision under section 15—65(a) of the Code providing an exemption to an "institution of public charity" is consistent with the first six *Korzen* factors, which essentially constitute the characteristics of a charitable organization, and that section 15—65's requirement that the property be used for charitable purposes corresponds with the seventh *Korzen* factor.

In the instant case, the Department concedes that some of the evidence related to the *Korzen* factors supports the Club's contention that it is an institution of public charity. For example, the Department

acknowledges that the Club has no capital stock or shareholders and "provides some charity in the form of allowing the public to view avant-garde art at no cost." The Department contends, however, that review of the evidence related to the remaining *Korzen* factors establishes that the Club did not qualify as an institution of public charity.

The Department contends the first *Korzen* factor, whether the organization benefits an indefinite number of people, weighs in its favor. The Department acknowledges that "some of the benefits derived are open to the general public." It notes, however, that other benefits, such as the opportunity to eat lunch in the Club's second-floor dining room and host parties at the Club, are available only to Club members and their guests.

We recognize that Club members enjoy dining and party-related benefits which are unavailable to the general public. These benefits, however, do not negate the fact that the Club is open to the general public Monday through Friday from 11 a.m. to 6 p.m. and on Saturdays from 11 a.m. to 4 p.m. In addition to giving the public the opportunity to view its permanent collection and temporary exhibits six days a week, the Club also hosts evening lectures, concerts, and performances that are open to the public. The factor in question does not require that the Club make available every conceivable benefit it offers, however incidental to its primary purpose, to an indefinite number of people. Rather, the factor requires us to review whether the Club benefits an indefinite number of people. Here, the Club regularly gives the general public the opportunity to view its permanent collection and temporary exhibits as well as the opportunity to attend various artistic programs and events that it hosts. Accordingly, we conclude that the Club does benefit an indefinite number of people.

The Department does not contest the fact that the Club satisfies the second *Korzen* factor. The Club has no capital stock, no shareholders, and pays no dividends to any of its members. It is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3) (1994)). It is undisputed that the Club did not make a profit. Thus, the second *Korzen* factor supports the Club's contention that it is a charitable institution.

The Department contends that the third *Korzen* factor, whether the Club derives its funds primarily through private and public donations and uses them for the purposes expressed in its charter, weighs in its favor because the majority of the Club's funding derives not from charity, but from investment income. To support this contention, the Department relies upon the ALJ's finding that 73% and 80% of the Club's funding derived from investment income for the years end-

ing in September 1996 and 1997, respectively. The Department does not dispute that this investment income was generated primarily by the endowment fund created with a portion of the proceeds from the sale of the "Golden Bird," or that the Club purchased the "Golden Bird" for its permanent collection in 1927 with $1,200 in donations. The Department argues, however, that the appreciation of the "Golden Bird" in excess of the inflation-adjusted value of the original $1,200 in donations constituted investment income rather than charity.

We find the Department's argument unpersuasive and note, as the Club asserts in its brief, that prohibiting organizations like it from putting charitable donations into an endowment fund that generates investment income would potentially threaten their very existence. Here, the Club kept the "Golden Bird" in its permanent collection for over 60 years after purchasing it in 1927 using $1,200 in donated funds. The Club sold the "Golden Bird" in order to purchase the subject property and establish a permanent location for its operation. The Club believed it was important to keep the sculpture in Chicago, and for that reason sold it to the Art Institute of Chicago for $12 million, which was less than its value. After purchasing the land at the new site in September 1995, the Club invested the remaining proceeds from the sale of the "Golden Bird" to create an endowment fund, the interest from which it uses to finance current operations. Based on these circumstances, we conclude that the Club did derive its funds primarily through private and public donations.

To support its contention that the money in the endowment fund did not derive from charity, the Department relies upon *Salvation Army v. Department of Revenue*, 170 Ill. App. 3d 336, 342 (1988). The Department's reliance on *Salvation Army* is misplaced. In *Salvation Army*, the reviewing court did not address whether the organization in question was a charitable organization, and in fact specifically noted that "it is undisputed that the Salvation Army is a charitable organization." *Salvation Army*, 170 Ill. App. 3d at 342. Rather, the reviewing court addressed whether the property in question, a thrift store which generated income through the sale of donated items to fund a rehabilitation center at another location, was used primarily for charitable purposes or alternatively for profit-making purposes. *Salvation Army*, 170 Ill. App. 3d at 342-44. The court found that the store was primarily used to make a profit and noted the fact that the Salvation Army ultimately used that profit for charitable purposes did not entitle the store to an exemption. *Salvation Army*, 170 Ill. App. 3d at 344. Here, the Club was used as a fine art museum, not as an art gallery for profit.

The Department identifies the fourth *Korzen* factor as "whether

the organization dispenses charity to all who need and apply for it and whether anyone associated with the organization received a gain or profit in a private sense." We consider these to be two separate factors and note that the Department does not argue in its brief that the Club failed to dispense charity to all who needed and applied for it. In fact, the Department concedes that the Club "did open its doors to the general public free of charge during certain hours." Moreover, although the Club's membership application did not specify that the membership initiation fee and the annual dues could be waived, the Club maintained and exercised an initiation fee and dues waiver policy based on financial hardship and inability to pay. In addition, the Club waived admission fees to exhibits, lectures, and presentations for those unable to pay but genuinely interested in attending the event in question.

With respect to the private gain or profit factor, the Department contends that the Club's executive director, chef, and sous chef personally profited to the extent that they received substantial salaries from the Club. The Department recognizes the fact that the Club compensated some of its employees does not necessarily mean those employees gained or profited in a private sense. See *Yates v. Board of Review*, 312 Ill. 367, 369 (1924) (noting that "[t]he employees of a charitable institution are not compelled to perform free services in order that the institution may be charitable"). The Department argues, however, that the Club's failure to present any evidence showing that their salaries were reasonable or showing that the services of the chef and sous chef were reasonably necessary to the Club's alleged charitable goal demonstrated that those employees profited in a private sense.

We take no position as to whether the salaries were reasonable but, rather, consider the absence of evidence in the record regarding reasonable salaries to weigh in the Department's favor because the taxpayer claiming the exemption has the burden of proof. *Lena Community Trust Fund, Inc.*, 322 Ill. App. 3d at 888. We decline, however, to find that this factor, together with the totality of the circumstances, including the other *Korzen* factors, supports a determination that the Club was not an institution of public charity. The Department additionally contends that certain Club members received a private gain or profit through the Club to the extent that they were allowed "to sell and promote their art and familiarize the community with their work" at the members exhibitions held every couple of years. The Department relies on *Du Page Art League v. Department of Revenue*, 177 Ill. App. 3d 895 (1988), to support this contention. *Du Page Art League* is distinguishable.

In *Du Page Art League*, a visual arts organization requested a tax

exemption for property it owned and used as an art gallery. *Du Page Art League*, 177 Ill. App. 3d at 897-98. The organization did not charge admission to the gallery and conducted free demonstrations and paid classes on the property. *Du Page Art League*, 177 Ill. App. 3d at 898. The organization only allowed its members, who paid annual dues, to exhibit art in the gallery and required members to give it 20% of the sale proceeds from every artwork they sold. *Du Page Art League*, 177 Ill. App. 3d at 897-98. Although the Department initially denied the exemption request, the circuit court found, on administrative review, that the organization was entitled to the exemption. *Du Page Art League*, 177 Ill. App. 3d at 897.

On appeal, the reviewing court affirmed the Department's denial and reversed the circuit court's decision. *Du Page Art League*, 177 Ill. App. 3d at 902. In support of its holding, the reviewing court noted that the organization, by only allowing its active members to show their work in the gallery, gave those members a distinct advantage over nonmembers, namely, the opportunity to sell, promote, and familiarize the community with their work. *Du Page Art League*, 177 Ill. App. 3d at 901. The court additionally noted that almost all of the organization's support derived from tuition, membership fees, and commissions from the sale of members' artwork. *Du Page Art League*, 177 Ill. App. 3d at 901.

Unlike the visual arts organization in *Du Page Art League*, here the Club regularly displays the art of nonmembers, both through its permanent collection and at the five exhibitions it holds each year. The record does not reflect that the Club regularly used its property to sell the works of its exhibiting artists or collected any type of commission based upon the subsequent sale of any of those works. The Club does host a members exhibit every couple of years. The record, however, does not reflect that members' works were sold at the members exhibit or that the primary purpose of that exhibit was to provide profit or monetary gain to those members showing their work. Finally, the organization in *Du Page Art League* relied on tuition, membership fees, and commissions from the sale of members' artwork to sustain its existence. Here, the Club relies primarily upon the investment income generated by charitable donations to sustain its existence. The record does not support the Department's argument that Club members received a private gain or profit as a result of participating in the members exhibitions held every couple of years at the club.

The Department next contends that the fifth *Korzen* factor, whether the organization appears to place any obstacles in the way of those seeking its benefits, also weighs in its favor. The Department

concedes that "there were no obstacles to non-members viewing the temporary exhibitions in the galleries on the first floor," but contends that both "overt and subtle barriers" impeded nonmembers' ability to view the permanent collection. The Department contends that the rule prohibiting nonmembers from eating in the dining room on the second floor constituted an overt barrier to their ability to view the portion of the permanent collection located in that room. In addition to this overt barrier, the Department argues that the absence of signs notifying nonmembers that portions of the permanent collection were located "behind closed doors" in rooms such as the library and the green room constituted a subtle barrier. The Department further argues that the glass doors enclosing the Mies van der Rohe staircase and the absence of signs stating that part of the permanent collection was located on the second floor also constituted a subtle barrier.

We find unpersuasive the Department's argument that the above factors actually constituted barriers which impeded nonmembers' ability to view the permanent collection. Although nonmembers were not allowed to eat lunch in the dining room, they were permitted to enter the dining room to view the permanent collection at any time during the hours the Club was open to the public. We recognize that signs were not posted outside several of the rooms to notify viewers that they contained pieces of the permanent collection. We also recognize that signs were not posted on or near the doors leading to the Mies van der Rohe staircase to notify viewers that the second floor was open to them.

We note, however, that the interior of the Club showcases the "floating" Mies van der Rohe staircase set in a travertine marble well or "box" enclosed behind glass double doors. Moreover, contrary to the Department's contention, nothing in the record indicates that the doors to the rooms on the first floor containing pieces of the permanent collection or the doors to the staircase were kept closed. In any event, even if those doors were kept closed, they would not have constituted a barrier given the presence of Club employees available to give tours and answer questions, the availability of publications regarding the permanent collection, the absence of signs prohibiting entry into the rooms or staircase, and our belief in the generally curious nature of museum goers.

The Department next contends that the Club failed to show that its building was used primarily for charitable purposes and therefore failed to satisfy the charitable use requirement under section 15—65 of the Code (35 ILCS 200/15—65 (West 1994)). This requirement, which relates not to the charitable characteristics of the organization in question but, rather, to the use of the property in question, is consistent with the final *Korzen* guideline.

The Department contends that the Club is primarily used by members as a place to gather for social events and that the Club's use by nonmembers in furtherance of the Club's alleged purpose of exposing the public to avant-garde art is only incidental or secondary to its social function. To support this contention, the Department relies on the Club's attendance figures, which reflect that from April 1997 through November 1999 only 6% of the visitors were "Walk In/ Students" whereas 94% of the visitors were people who used the dining room, attended special programs or events, or attended private parties. The Department suggests that "most of the people in the 'Dining/Events/Parties' category *presumably* were dues-paying members" because nonmembers could not use the dining room or attend private parties except as guests of members. (Emphasis added.) Whatever the case, the Department argues, the Club did not introduce any evidence to establish the number of visitors in the "Dining/Events/ Parties" category who were members of the general public despite its burden of proving clearly and convincingly that it was entitled to an exemption.

The Department assumes that the sole way to determine the primary use of a given piece of property is to look at the way the greatest number of people used it. We agree with the Department that the percentage of the total number of visitors who use property in a particular way is relevant to the determination of how that property is primarily used. We also agree with the Department that the attendance figures introduced at the hearing do not conclusively establish what percentage of the Club's visitors were members of the public using the property to learn more about art. While the majority of the 68,063 people included in the "Dining/Events/Parties" category could have been members of the public attending special artistic events, the majority of those people may have been the friends and guests of Club members. We disagree with the Department, however, that the absence of evidence demonstrating what specific number of visitors were members of the general public using the Club for its stated charitable purpose requires us to conclude that the Club was not used primarily for charitable purposes.

In addition to the percentage of total visitors who use the Club for its stated charitable purpose, the percentage of the property allocated and used for that purpose, and the amount of time that portion of the property is used for that purpose, are also relevant to the determination of how the property is primarily used. Here, the Club's building is allocated and used primarily for charitable purposes, *i.e.*, to display the permanent collection and temporary exhibits, to host special artistic events open to the public, and to oversee the Club's operation

and administration. The permanent collection and temporary exhibits are available for the public to view during the week from 11 a.m. until 6 p.m. and on Saturdays from 11 a.m. until 4 p.m. In addition, the Club opens its doors to the public after hours for free artistic events and programs advertised in local newspapers and magazines. The kitchen and dining room, where only members and their guests may eat from noon to 2 p.m. and which may only be used by members and those they sponsor for private parties after hours, comprise only 14% of the building's space. The dining room does contain pieces of the permanent collection, and nonmembers may enter it to view those pieces at any time the Club is open to the public. This allocation of space, along with the ample amount of time the Club is open to the general public, reflects that the Club primarily uses the property for its stated charitable purpose of exposing the public to modern and avant-garde art, and that the dining/social function of the Club was secondary to this purpose.

Finally, to support its contention that the Club is not primarily used for charitable purposes, the Department emphasizes that the Club's membership structure erects social and monetary barriers which impede nonmembers' ability to join the Club. Specifically, the Department notes that a prospective member needs to know both a Club member who is willing to sponsor his application and two additional Club members who are willing to sign his application as "seconders." In addition, the Department notes that the initiation fee and annual dues are substantial, and that nothing in the application indicates that those costs may be waived.

We agree with the Department that not every member of the public will be able to join the Club, and we recognize that the Club is incidentally used exclusively by members for social gatherings unrelated to the Club's purpose of exposing the public to art. However, we reject the Department's contention that the Club's membership structure negates the fact that the Club is used primarily for the purpose of exposing the public to modern and avant-garde art. Indeed, the initiation fees and dues paid by members constitute a source of revenue used by the Club to support its daily operation and thus contribute to its charitable function. Finally, while we recognize the Club's application did not specifically notify prospective members of its membership fee waiver policy based on financial hardship, we believe the Club's exercise of that policy demonstrated that membership fees did not constitute a monetary barrier to those genuinely interested in becoming members of the Club.

## CONCLUSION

■ Since 1916 the Arts Club has served the cultural needs of the

City of Chicago by making available to the public at no charge avant-garde visual art and numerous exhibits of literary, music and performance art. Richard Christiansen, a member of the Club's board of directors, chief critic and senior writer at the Chicago Tribune, and an expert in the field of visual and performance art testified at the administrative hearing regarding why art is important to the community:

> "[Art] also helps us enlarge our capacities as people who exist in the modern world. We're able to understand and cope with things that I think we would not otherwise understand unless we had art. Unless we saw a play or movie or work of art that somebody said to us, yes, I understand that, that's what I was trying to say. Art is important very much so in that way. *** [I]t's what makes great cities great. It's what makes us want to live in a city, because there is a variety of experience in our works and music and dance and theater and visual and performing arts. It stamps a city as being an important place."

For the reasons previously discussed, we conclude that the Department's decision to deny the Club's request for a 1995 tax exemption for the property in question was clearly erroneous. The primary purpose of the Club is to benefit the community as a fine art museum. Accordingly, we reverse the order of the circuit court affirming the Department's decision.

Reversed.

BUCKLEY and GALLAGHER, JJ., concur.